THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:21-cr-00046-RDM-3 |
| **GARY WILSON,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**DEFENDANT WILSON'S MOTION TO SUPPRESS IDENTIFICATION,
STATEMENTS, AND TANGIBLE EVIDENCE**

Gary Wilson, by and through undersigned counsel, respectfully files this motion to suppress, pursuant to the Fourth, Fifth, and Sixth Amendments of the United States Constitution, identifications, statements, and tangible evidence. Specifically, Mr. Wilson requests that this Court suppress (i) Witness 1's identification and identification testimony; (ii) Mr. Wilson's statements to law enforcement on September 11, 2021 and September 13, 2021 and the fruits thereof; and (iii) any evidence seized pursuant to the search warrant executed on September 7, 2021, and the fruits thereof. In support of this motion, Mr. Wilson states the following.

**BACKGROUND**

Mr. Wilson is before this Court charged by a Third Superseding Indictment with one (1) count of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); one (1) count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); one (1) count of Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); one (1) count of Entering and Remaining in the Gallery of Congress, 40 U.S.C. § 5104(e)(2)(B); one (1) count of Obstruction of

an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; and Theft of Government Property, in violation of 18 U.S.C. § 641. *See* ECF No. 115. Mr. Wilson's charges stem from his alleged involvement in the events of January 6, 2021.

I. **IDENTIFICATION**[1]

On August 6, 2021, FBI agents visited Witness 1, Mr. Wilson's father, and informed him that they would like to ask him questions in relation to Mr. Wilson's alleged involvement in the events of January 6, 2021. *See* Exhibit A. The agents showed Witness 1 a total of seven (7) images from the events of January 6, 2021, the first five (5) of which were cropped images depicting only an individual who the agents believed to be Mr. Wilson. *See* Exhibit B. When asked to identify the individual in the images, Witness 1 stated that the individual appeared to be Mr. Wilson. *See* Exhibit A.

II. **STATEMENTS TO LAW ENFORCEMENT**

On September 9, 2021, Mr. Wilson was charged by complaint in the United States District Court for the District of Columbia regarding his alleged involvement with the events of January 6, 2021. *See* ECF No. 1. Specifically, the complaint charged Mr. Wilson with one (1) count, respectively, of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); Entering and Remaining in the Gallery of Congress, 40 U.S.C. §

---

[1] The government memorialized Witness 1's interview in the report designated as Exhibit A, which states that Witness 1 identified the images provided in the document designated as Exhibit B. Because of the disparities between the interview report and Witness 1's recollection of the interview, this Motion refers to what was obtained from Witness 1's recollection of the interview.

5104(e)(2)(B); and Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2. *See id.*

On or about September 9, 2021, Special Agent ("SA") Matthew Foulger attempted to call Mr. Wilson. *See* Exhibit C. Mr. Wilson returned SA Foulger's call later that day. *See id.* During the call, SA Foulger explained to Mr. Wilson that there was an arrest warrant for him and recommended that he turn himself in on September 13, 2021. *See id.* Mr. Wilson advised SA Foulger to speak with his attorney, David Finn. *See id.*

Later that day, SA Foulger left a voicemail on Mr. Finn's phone. *See id.* On or about September 10, 2021, Mr. Finn called SA Foulger, who explained to Mr. Finn that there was an arrest warrant for Mr. Wilson and a search warrant for clothing the government believed Mr. Wilson wore on January 6, 2021. *See id.* SA Foulger also advised Mr. Finn that Mr. Wilson needed to self-surrender at the FBI's Salt Lake City Field Office on September 13, 2021 and to bring the clothes listed in the search warrant. *See id.* Mr. Finn stated that he would have Mr. Wilson self-surrender at the requisite time and place. *See id.*

Following the call, SA Foulger emailed Mr. Finn the warrants and attachments, and Mr. Finn confirmed receipt. *See id.* Later that day, SA Foulger texted Mr. Finn asking to confirm whether Mr. Wilson had and would bring the items in the search warrant. *See id.* Mr. Finn did not respond. *See id.*

On or about September 11, 2021, SA Foulger texted Mr. Wilson to verify that he was planning to self-surrender on September 13, 2021. *See id.* Mr. Wilson responded affirmatively. *See id.* SA Foulger then sent Mr. Wilson the attachment to the search warrant listing the items of clothing to be seized and asked Mr. Wilson if he had any questions. *See id.* Mr. Wilson responded that he did not. *See id.*

On September 13, 2021, at approximately 8:30 AM, Mr. Wilson self-surrendered at the FBI's Salt Lake City Field Office. *See* Exhibit D. Mr. Wilson was then arrested and placed in handcuffs by Task Force Officer ("TFO") Lloyd Davis and SA Foulger, *see id.*, who were wearing FBI lanyards and had guns holstered. Following Mr. Wilson's arrest, SA Foulger queried Mr. Wilson about the clothing items sought in the search warrant. *See id.* Mr. Wilson responded that he believed he donated those clothes. *See id.* SA Foulger explained to Mr. Wilson that the government still needed to execute the search warrant since he did not bring the clothes with him. *See id.*

The agents transported Mr. Wilson to be processed at the federal courthouse. *See id.* While at the federal courthouse, Mr. Wilson was placed in cuffs that went around his wrists and ankles and waited in a cell in the Marshal's cellblock. After he was processed, the FBI agents placed Mr. in handcuffs and transported him back to the FBI Field Office, during which time, SA Foulger stated to Mr. Wilson that a search would have to be conducted at Mr. Wilson's residence and asked Mr. Wilson if his wife could look for the specified items. *See id.* Mr. Wilson responded that he was no longer in possession of the clothing. *See id.* SA Foulger asked Mr. Wilson if he was sure that he donated the clothing. *See id.* Mr. Wilson responded, "No comment." *Id.* Mr. Wilson further stated that he kept personal items in the RV at his residence on Bonanza Court and that he also had a storage unit. *See id.* Mr. Wilson advised the agents that he wanted them to go through his attorney. *See id.*

At approximately 9:40 AM, Mr. Wilson and the agents returned to the FBI Field Office. *See id.* At 1:00 PM, from the Field Office, Mr. Wilson appeared for his initial appearance via Zoom. *See id.* ▮

▮

4

5

██████████████████████████████████████████████████████████████

██████████████████████████████████████ *See* Exhibit E.

### III.  SEARCH OF RESIDENCE

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████ *See* Exhibit F.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████ *See* Exhibit G.

**ARGUMENT**

**I.     DUE PROCESS CLAUSE: IDENTIFICATION**[2]

The Due Process Clause of the Fifth Amendment guarantees a defendant's right to suppress out-of-court identifications and in-court identification testimony resulting from unnecessarily suggestive procedures conducive to mistaken identification. *See Neil v. Biggers*, 409 U.S. 188, 198-99 (1972). Proceeding from this premise, courts have developed a two-pronged test to determine the admissibility of identifications. An identification must be suppressed where (1) the identification procedure was impermissibly suggestive, *see Biggers*, 409 U.S. at 198-99, based on factors such as "the size of the array, the manner of presentation by the officers, and the array's contents," *United States v. Cooper*, 85 F.Supp.2d 1, 36 (D.D.C. 2000) (citation omitted), and (2) the identification is not otherwise sufficiently reliable based upon: (a) the witness' opportunity to view the defendant at the time of the crime; (b) the witness' degree of attention at the time of the crime; (c) the accuracy of the witness' description of the defendant prior to the identification; (d) the witness' level of certainty when identifying the defendant; and (e) the length of time elapsed between the crime and the confrontation, *see Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Biggers*, 409 U.S. at 199-200. Admission of Witness 1's identification or identification testimony would violate the Fifth Amendment's Due Process Clause, warranting its suppression.

The record makes clear that significant indicators of suggestiveness existed during Witness 1's identification. Here, the FBI visited Witness 1, a relative of Mr. Wilson, and informed him that they would like to ask him questions in relation to Mr. Wilson's alleged involvement in the events

---

[2] Mr. Wilson addresses two preliminary matters. First, although admitting an identification in violation of the Due Process Clause may be harmless error if evidence of guilt is overwhelming, *see Chapman v. Cal.*, 386 U.S. 18, 24 (1967), here, evidence of Mr. Wilson's guilt is not overwhelming. Second, there is no independent untainted source that would otherwise allow for identification testimony by Witness 1. *See United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007) (citation omitted).

of January 6, 2021. *See* Exhibit A. By providing this context prior to the identification, the agents set an expectation of who they believed was depicted, making it more likely for Witness 1 to make this connection.

Additionally, the number and content of the images in the array created an unduly suggestive procedure. The photo array shown to Witness 1 consisted of seven (7) images, each of which are from the chaotic setting of the events of January 6, 2021. *See* Exhibit A; Exhibit B. The first five (5) images shown were cropped images only depicting an individual who the government alleges is Mr. Wilson. *See id.* The last two (2) images obscurely depict other individuals, with the person alleged to be Mr. Wilson at the center or focus of the images. *See id.* A photo array cannot be so limited that the individual alleged to be the defendant is the only individual depicted in all of the images. *See Brathwaite*, 432 U.S. at 133-34 ("As *Simmons* warned, the danger of error is at its greatest when law enforcement "display[s] to the witness only the picture of a single individual . . ."); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) ("The array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator."); *Rattler*, 475 F.3d at 412 (citation omitted) ("This [C]ourt has concluded that [identifications arising from single-photograph displays] are 'highly suggestive.'"). What's more, the FBI asked Witness 1 if the person identified in each photograph depicted Mr. Wilson; by doing this, the FBI filled in the blank for Witness 1.

Witness 1's identification is unduly suggestive and must be suppressed unless sufficient guarantees of reliability exist. However, no such guarantees exist here. Witness 1 had no opportunity to view the individual alleged to be Mr. Wilson at the time of the alleged offense and was not present during the alleged conduct. And, even if Witness 1 did have personal knowledge,

7

seven (7) months had passed since the alleged conduct before the identification was made; this length of time is significant given Witness 1's advanced age.

Additionally, Witness 1 did not provide a description of Mr. Wilson prior to the identification. When making the identification pursuant to the agent's direct line of questioning, Witness 1 informed the agents that the individual depicted in the images looked like Mr. Wilson; no notable degree of certainty was afforded.

Further undermining the reliability of the identification are the surrounding circumstances of the identification. Witness 1 has significant diagnosed issues regarding his hearing and, as aforementioned, is of old age; this makes it difficult to navigate conversations without confusion and disorientation. And, even for the hypothetical person who is not ninety (90) years old and is in top physical and mental shape, the images in the photo array were dark and/or blurry and offered no sincere ability to make an accurate or otherwise meaningful identification of any individual, *see id.*

Witness 1's identification and identification testimony violate the Fifth Amendment's Due Process Clause and therefore must be suppressed.

## II.     FIFTH AMENDMENT: STATEMENTS TO LAW ENFORCEMENT

A defendant's statement is admissible only if it is (1) elicited in conformance with the mandates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny; and (2) voluntary under the U.S. Constitution's Fifth Amendment Due Process Clause, *see Colorado v. Connelly*, 479 U.S. 157 (1986). Accordingly, any and all of Mr. Wilson's statements made to law enforcement on September 9, 2021 and September 13, 2021 must be suppressed.

A.     **Mr. Wilson's Pre-*Miranda* Statements from September 13, 2021 Were Not Elicited in Conformity with *Miranda* and Its Progeny.**[3]

The Court must suppress Mr. Wilson's statements from September 13, 2021 and the fruits thereof because law enforcement failed to conform with the mandates of *Miranda*, 384 U.S. 436, and its progeny. Specifically, Mr. Wilson's pre-*Miranda* statements from September 13, 2021 were made pursuant to custodial interrogation.

*Miranda*, 384 U.S. 436, and its progeny prohibit the government from using statements stemming from custodial interrogation in its case-in-chief unless the defendant was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" and voluntarily, knowingly, and intelligently elected to waive those rights. *Miranda*, 384 U.S. at 444. Failure to administer *Miranda* warnings creates a presumption of compulsion, and any unwarned statements must be suppressed. *See Oregon v. Elstad*, 470 U.S. 298 (1985).

For purposes of *Miranda* and its progeny, "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. More specifically, interrogation occurs when law enforcement engages in questioning reasonably likely to result in an incriminating response, *see Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *State v. Franklin*, 299 S.Ct. 133, 136 (1989), and custody occurs when, in the totality of the circumstances, a reasonable person would not have felt free to terminate the encounter and leave, *see Thompson v. Keohane*, 516 U.S. 99, 112 (1995). When assessing the totality of the circumstances, courts have looked to factors such as when and where the interrogation occurred;

---

[3] As a preliminary matter, for purposes of argument preservation, Mr. Wilson did not knowingly, intelligently, and voluntarily waive his *Miranda* rights at any juncture.

9

how long the interrogation lasted; how many members of law enforcement were present; whether members of law enforcement were uniformed; whether law enforcement engaged in a show of authority; whether the defendant was told that he was free to leave or suspected of a crime; whether law enforcement deprived the defendant of bodily necessities; whether the law enforcement engaged in physical contact; the presence of actual physical restraint on the defendant or things equivalent to actual restraint, such as placing the defendant in handcuffs, moving or isolating the defendant, or controlling the direction or speed of a defendant's movement; how the defendant arrived at the place of questioning; and what happened after the interrogation, such as whether the defendant left freely or was arrested or otherwise detained. *See, e.g.*, *Michigan v. Chesternut*, 486 U.S. 567, 575 (1988); *Miranda*, 384 U.S. at 508.

Mr. Wilson was in custody when questioned by law enforcement about the subject matter of this case prior to receiving *Miranda* warnings. B the time the agents began to question Mr. Wilson about the clothing items being sought pursuant to the search warrant, no reasonable person would have felt free to terminate the encounter and leave. Mr. Wilson had been formally arrested at the FBI Field Office pursuant to an arrest warrant and placed in handcuffs by FBI agents who were visibly armed and wearing FBI credentials on lanyards. *See* Exhibit D. Circumstances only escalated from there, such as Mr. Wilson being placed in a cell and a set of wrist and ankle cuffs.

The agents engaged in conversation reasonably likely to result in an incriminating response from Mr. Wilson. SA Foulger queried Mr. Wilson about obtaining the clothing items suspected to be worn by Mr. Wilson during the alleged conduct; whatever Mr. Wilson's response, it could be nothing but incriminating. *See* Exhibit D. Moreover, SA Foulger *knew* engaging in such a discussion would elicit an incriminating response because this same line of discussion had already

elicited incriminating responses on a previous occasion on September 9, 2021, *see* Exhibit C, and in the first instance on September 13, 2021, *see* Exhibit D.

Because Mr. Wilson's statements were not elicited in conformity with *Miranda* and its progeny, his statements and the fruits thereof must be suppressed.

> **B.** **Mr. Wilson's Statements Were Not Voluntary for Purposes of the Due Process Clause.**

All of Mr. Wilson's statements and the fruits thereof must be suppressed because they were involuntarily procured, in violation of the Fifth Amendment's Due Process Clause. Due process requires that a defendant's statement must be voluntary (or free from government coercion), under the totality of the circumstances, in order for the government to use such statement for any purpose at trial, regardless of the statement's truth or falsity. *See Connelly*, 479 U.S. at 167; *Jackson v. Denno*, 378 U.S. 368, 376 (1964). The government bears the burden of proving voluntariness by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 484 (1972).

In determining due process voluntariness, the crucial inquiry is whether the subject's will was "overborne" or his "capacity for self[-]determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (citations omitted). Courts use the same analysis and look to the same factors as those discussed for the *Miranda* custody inquiry when assessing the totality of the circumstances for purposes of due process voluntariness. *See Connelly*, 479 U.S. at 169; *Cristobal*, 293 F.3d at 140.

Law enforcement subjected Mr. Wilson to coercive pressures more than sufficient for his will to be overborne or for his capacity for self-determination to be critically impaired, rendering any statements involuntary and therefore inadmissible. Following his formal arrest at the FBI field office, law enforcement agents engaged in conversation discussing the offenses at issue with Mr. Wilson; Mr. Wilson was in handcuffs during the entirety of the interaction and was escorted to and

11

from various coercive settings, such as the FBI Field Office, an agent's vehicle, and the U.S. Marshals' cell block. *See* Exhibit D. At least two (2) law enforcement agents closely accompanied Mr. Wilson throughout the many hours prior to his release by the Court. *See, e.g.*, *id.* The federal agents who were in the presence of Mr. Wilson had official FBI insignia on their lanyards, and their guns were visible in their holsters. When placed in a cell in the Marshal's cell block, Mr. Wilson sat and waited in a different set of cuffs which restricted both his ankles and wrists. He was filled with fear and confusion. Finally, he was released from the cellblock to the FBI, who again placed him handcuffs before they escorted him back to the FBI Field Office. Despite Mr. Wilson's clear and repeated articulation that he wanted the agents to speak directly to his lawyer about anything case-related, SA Foulger continued to probe. *See* Exhibit C; Exhibit D. Indeed, even while driving back to the Field Office, SA Foulger stated to Mr. Wilson that a search would have to be conducted at Mr. Wilson's residence and asked Mr. Wilson if his wife could look for the specified items. *See* Exhibit D. Moreover, once back at the Field Office, Mr. Wilson waited for hours to go before the Court for his initial appearance. *See id*.

Because Mr. Wilson's statements were involuntarily procured in violation of the Due Process Clause, his statements and the fruits thereof must be suppressed.

### III. THE SIXTH AMENDMENT

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The Sixth Amendment's right to counsel attaches after, *inter alia*, the initiation of formal charges,[4] *see Moran v. Burbine*, 475 U.S. 412, 431-32 (1986) (citations omitted); *Chewning v.*

---

[4] Further supporting the notion that the Sixth Amendment right to counsel attaches following any formal charge is the fact that it has been incorporated by the Fourteenth Amendment yet the right to a grand jury has not, leaving open the possibility that "formal charges" might mean something other than bringing charges via information or indictment depending on the state's procedures.

12

*Rogerson*, 29 F.3d 418, 421 (8th Cir. 1994) (finding that the Sixth Amendment right to counsel attached when formal charges were brought against the defendant via criminal complaint); *Cooper*, 85 F.Supp.2d at 36 (appearing to cite *Chewning*, 29 F.3d 418, affirmatively for such proposition); *see also Escobedo v. State of Ill.*, 378 U.S. 478, 485 (1964) ("The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference."), and applies at all critical stages of a case, *see, e.g.*, *Massiah v. United States*, 377 U.S. 201, 206 (1964) (holding that the defendant's Sixth Amendment right to counsel was violated where he was denied counsel during post-charge interrogation); *Cooper*, 85 F. Supp. 2d at 21 (citing *Michigan v. Jackson*, 475 U.S. 625, 636 (1986) ("The Supreme Court has held that once the Sixth Amendment right to counsel has attached and has been invoked by the defendant, the police may not initiate a custodial interview of the defendant without the presence of counsel."). Once the Sixth Amendment right to counsel has attached, the government may not use in its case-in-chief incriminating statements "deliberately elicited" from the accused by law enforcement, unless the accused knowingly, voluntarily, and intelligently waived his right. *See Brewer v. Williams*, 430 U.S. 387, 399-400 (1977) (concluding arraigned defendant's incriminating statements inadmissible when made in response to speech by police officer during car ride without presence of counsel because officer's speech tantamount to interrogation); *see also Fellers v. United States*, 540 U.S. 519, 524-25 (2004) (concluding Sixth Amendment right to counsel violated when defendant made incriminating statements during voluntary discussion at home because the right had attached and discussion occurred without informed waiver of Sixth Amendment rights).

Mr. Wilson's statements to law enforcement on September 11, 2021 and September 13, 2021 and the fruits thereof must be suppressed, as they are the product of violations of his Sixth Amendment right to counsel.

On September 9, 2021, the government brought formal charges against Mr. Wilson. *See* ECF No. 1. On the same day, SA Foulger called Mr. Wilson, and, when Mr. Wilson returned his call, Mr. Wilson directed SA Foulger to speak with his attorney, Mr. Finn. *See* Exhibit C. Later on September 9, 2021, Mr. Finn and SA Foulger spoke over the phone in substance; Mr. Finn confirmed that he would have Mr. Wilson self-surrender at the requisite time and place. *See id.*

On September 11, 2021, SA Foulger texted Mr. Wilson asking whether he was planning to self-surrender on September 13, 2021 and if he had any questions about the search warrant he attached that listed the items of clothing to be seized. *See* Exhibit D. Just two days prior, Mr. Wilson directed SA Foulger to speak with Mr. Finn on the exact same subject matter. *See id.* SA Foulger disregarded Mr. Wilson's i of his Sixth Amendment right to counsel.

On September 13, 2021, SA Foulger again asked about the subject matter of the case at least twice, after knowing Mr. Wilson had invoked his right to counsel. *See id.* His right to counsel blatantly ignored, Mr. Wilson eventually resorted to responding, "No comment.," and again directed the agents to go through his attorney. *Id.*

Because law enforcement violated Mr. Wilson's right to counsel afforded by the Sixth Amendment, any statements made by Mr. Wilson and the fruits thereof must be suppressed.

IV.  **THE FOURTH AMENDMENT**

The Fourth Amendment to the United States Constitution provides that every search or seizure must be reasonable. *See* U.S. Const. amend. IV. Subject to a few "jealously and carefully drawn" exceptions, searches or seizures are per se unreasonable when executed absent a warrant

based on probable cause and delineating with particularity the areas to be searches and the persons or items to be seized. *Adams v. Williams*, 407 U.S. 143, 154 (1972). The government holds the burden of proving by a preponderance of the evidence that there was a need to employ a respective exception. *See id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455 (1971)).

Probable cause can be lost if a search warrant is not timely executed. *See United States v. McCormick*, No. CR 18-359-4 (JDB), 2019 WL 3718944, at *2 (D.D.C. Aug. 7, 2019) (quoting *Sgro v. United States*, 287 U.S. 206, 215 (1932)) ("A warrant will lack adequate support—and hence be invalid—if the facts contained in its supporting affidavit have 'become stale by the passage of time.'"). For a search warrant to be valid, officers must offer "proof . . . of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Id.* at *2-3 (citing *Sgro v. United States*, 287 U.S. 206, 210 (1932)). In determining the "likelihood that the evidence sought is still in place," courts consider factors such as the character of the crime (whether it was a chance encounter or a continuing conspiracy), the character of the criminal (whether he is nomadic or entrenched), the character of the thing to be seized (whether it is perishable and easily transferable or of enduring utility to its holder), the character of the place to be searched (whether it is a mere criminal forum of convenience or secure operational base). *See id.* (citing *United States v. Matthews*, 753 F.3d 1321, 1325 (D.C. Cir. 2014)).

In what is known as the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks v. United States*, 232 U.S. 382, 398 (1914). Additionally, any evidence obtained as a direct or indirect result of an illegal search or seizure constitutes fruit of the poisonous tree and must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

There are limited exceptions to the exclusionary rule. For example, under the "good faith exception," a search conducted pursuant to a legally invalid search warrant is still constitutional for Fourth Amendment purposes so long as certain criteria are met. *United States v. Leon*, 468 U.S. 897, 920 (1984) (discussing the "good faith exception"). However, the "good faith exception" does not apply in instances such as where (a) an affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (b) a magistrate issuing a warrant relies on information in an affidavit that the affiant knew was false or would have known was false except for the affiant's reckless disregard for the truth; (c) a warrant is so facially deficient as to particularity that the executing officers could not reasonably presume it to be valid; or (d) the issuing magistrate wholly abandoned his detached and neutral judicial role. *Id.* at 923.

### A. The Court Must Suppress Any Evidence Seized and the Fruits Thereof Because the Search Warrant Was Not Particularized as to the Places to be Searched and the Items to be Seized.

The Court must suppress any evidence seized and the fruits thereof because the search warrant was not particularized as to the places to be searched. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exhibit F. The language utilized in Attachment A was too broad to where law enforcement was left to their own discretion about how to implement the search. Specifically, the language provided for the possibility for Mr. Wilson's pockets to be searched when there was no likelihood that the clothing could have been found there.

The Court must also suppress any evidence seized and the fruits thereof because the search warrant was not particularized as to the items to be seized. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* Such a description is far too expansive to satisfy the Fourth Amendment's particularity requirement, as it does not provide any sincere guidance to those executing the search warrant. What's more, Attachment B did not reference that the clothing sought was the clothing law enforcement believed Mr. Wilson wore on January 6, 2021, nor did it include images of the items or brand names for all but one (1) item to help limit the scope of the search.

Because the search warrant was not particularized as to the places to be searched, the Court must suppress any evidence seized and the fruits thereof.

        **B.**    **The Court Must Suppress Any Evidence Seized and the Fruits Thereof Because Probable Cause Did Not Exist at the Time the Search Warrant was Executed.**

The Court must suppress any evidence seized and the fruits thereof because probable cause did not exist at the time the search warrant was executed by law enforcement.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Exhibit G. By the time the government executed the search warrant, there was no probable cause for the search.

On at least three (3) occasions, SA Foulger was informed that Mr. Wilson did not have those clothing items in his possession. On September 13, 2021, when asked by agents about the clothing, Mr. Wilson twice told the agents that he was no longer in possession of those clothes. *See* Exhibit D. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *See* Exhibit E.

More than sufficient time passed between when Mr. Wilson was notified about the search warrant and the date that the search warrant was executed ██████████████████████

████████████████████████████████████████████ *See* Exhibit C; Exhibit G. Given how easily transferrable clothing is, the time between the government's notice and the date of the search represents more than enough time for a member of the household to dispose of the clothing, if, in fact, it was in Mr. Wilson's possession.

Because probable cause did not exist when the search warrant was executed, the Court must suppress any evidence seized and the fruits thereof.

## CONCLUSION

In light of the above, Mr. Wilson respectfully requests that the Court suppress (i) Witness 1's identification and identification testimony; (ii) Mr. Wilson's statements to law enforcement on September 11, 2021 and September 13, 2021 and the fruits thereof; and (iii) any evidence seized pursuant to the September 7, 2021 search warrant and the fruits thereof

Respectfully submitted,

_____/s/_____
David Benowitz, D.C. Bar No. 451557
Amy C. Collins, D.C. Bar No. 1708316
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@pricebenowitz.com
AmyC@pricebenowitz.com

*Counsel for Gary Wilson*

**EXHIBIT LIST**

| Exhibit Name | Page Number(s) | Description |
| --- | --- | --- |
| Exhibit A | 2, 7 | WilsonMTSExhibitA_266O-SU-3474912_0000009 |
| Exhibit B | 2, 7 | WilsonMTSExhibitB_266O-SU-3474912_0000009_1A0000010_0000001 |
| Exhibit C | 3, 11, 12, 14, 18 | WilsonMTSExhibitC_266O-SU-3474912_0000018 |
| Exhibit D | 4, 10, 11, 12, 14, 17 | WilsonMTSExhibitD_266O-SU-3474912_0000019 |
| Exhibit E | 5, 18 | ▉▉▉▉▉▉▉▉▉▉ |
| Exhibit F | 5, 16, 17 | ▉▉▉▉▉▉▉▉▉▉ |
| Exhibit G | 5, 7, 17, 18 | ▉▉▉▉▉▉▉▉▉▉ |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of July 2023, I have served this Motion upon all parties in this matter through the CM/ECF system.

_____/s/_____
David Benowitz