```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,
                                         Criminal Action
 4              Plaintiff,               No. 1: 21-46

 5         vs.                           Washington, DC
                                         March 20, 2024
 6    PATRICK MONTGOMERY - 1,
      BRADY KNOWLTON - 2,                11:12 a.m.
 7    GARY WILSON - 3,

 8              Defendants.
      _____/
 9

10                 TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RANDOLPH D. MOSS
11              UNITED STATES DISTRICT JUDGE

12
      APPEARANCES:
13
      For the Plaintiff:     CAROLINA NEVIN
14                           KELLY ELIZABETH MORAN
                             MICHAEL ROMANO
15                           UNITED STATES ATTORNEY'S OFFICE
                             Criminal Section
16                           601 D Street NW
                             Washington, DC 20001
17

18    For Defendant Montgomery:  ROGER ROOTS
                             10 Dorrance Street
19                           Suite 700 #649
                             Providence, RI 02903
20

21              APPEARANCES CONTINUED ON NEXT PAGE

22
      Court Reporter:        SHERRY LINDSAY
23                           Official Court Reporter
                             U.S. District & Bankruptcy Courts
24                           333 Constitution Avenue, NW
                             Room 6710
25                           Washington, DC 20001
```

1                          APPEARANCES

2

3    For Defendant Knowlton:  RONALD S. SULLIVAN , JR.
                              RONALD SULLIVAN LAW PLLC
                              1300 I Street NW
4                             Suite 400 E
                              Washington, DC 20005

5

6    For Defendant Wilson:    DAVID BARRY BENOWITZ
                              RAMMY GEORGE BARBARI
7                             PRICE BENOWITZ LLP
                              409 Seventh Street, NW
8                             Suite 200
                              Washington, DC 20004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  Criminal case 21-46, United
3    States of America versus Patrick Montgomery, Brady Knowlton,
4    and Gary Wilson.
5            Will counsel please approach the podium and state
6    their name for the record, starting with government counsel.
7            MS. NEVIN:  Good morning, Your Honor.  Carolina
8    Nevin, Kelly Moran and Michael Romano for the United States.
9            We are joined at counsel table with paralegal
10   Josephine Roberts, and Special Agent Jeffrey Weeks.
11           THE COURT:  All right.  Good morning.
12           MR. SULLIVAN:  Good morning, Your Honor.  Ronald
13   Sullivan on behalf of Brady Knowlton.
14           THE COURT:  Good morning.
15           MR. ROOTS:  Good morning, Your Honor.  Roger Roots on
16   behalf of Patrick Montgomery.  I want to say John Pierce is in
17   Florida and he is in a Zoom hearing in another case.
18           THE COURT:  Okay.
19           MR. BARBARI:  Good morning, Your Honor.  Rammy
20   Barbari and David Benowitz on behalf of Mr. Wilson.
21           THE COURT:  All right.  Good morning to you as well.
22           So I have spent quite a bit of time reviewing the
23   exhibits, some of them multiple times, going through the
24   stipulated facts and considering how appropriately to resolve
25   this case, so I will give you my decision now.  I will start by
```

1    incorporating all of the stipulated facts into my conclusions

2    of fact.  I have accepted into evidence as well Exhibits 1

3    through 17 and have considered those in my deliberations.  I

4    will briefly go through some of the stipulated facts.  But

5    don't take the fact that I am only mentioning some of them to

6    mean that I am not relying on all of the stipulated facts for

7    purposes of my decisions today.

8            And I will elaborate on some of the stipulated facts

9    based on my review of the evidence by way of just general

10   background.  And not with respect to the particular defendants

11   in this case.  The stipulated facts conclude that on January 6,

12   2021, the exterior plaza of the US Capitol was closed to

13   members of the public.  And the grounds around the Capitol were

14   posted and cordoned off.  And the entire area as well as the

15   Capitol building itself was restricted by the US Capitol Police

16   due in part to the fact that the vice president and the

17   immediate family of the vice president would be among those

18   visiting the Capitol complex that day.  And the Secret Service

19   is tasked with protecting the vice president and his immediate

20   family at the Capitol complex.

21           As we all know, on January 6, 2021, a joint session

22   of the United States Congress was convened at the Capitol for

23   purposes of certifying the results of the 2020 presidential

24   election.  And then they were acting pursuant to the Twelfth

25   Amendment to the Constitution as well as 3 U.S.C. sections 15

1    through 18.  And they were required to deliberate and to

2    determine whether to certify the results of the election based

3    in part upon the assessment of the ballots lists, certificates

4    and potentially written objections that were proffered that

5    day.

6            The joint session began at approximately 1:00 p.m.

7    And shortly thereafter, by approximately 1:30 p.m., the House

8    and Senate had adjourned to their separate chambers to resolve

9    an objection that had been raised.  Vice President Pence was

10   present and presiding over the Senate at that time.

11           As the proceedings continued in both the House and

12   senate, with the vice president present, the -- certain

13   individuals breached the Capitol.  The crowd was not lawfully

14   authorized to enter or remain in the building at that time.

15   The certification proceedings were still underway.  And the

16   exterior doors and windows of the Capitol were locked and

17   otherwise secured.

18           Shortly thereafter at about 2:20 p.m. members of the

19   House of Representatives and the United States Senate,

20   including the vice president, were instructed to and did

21   evacuate the chamber in light of the assault on the Capitol

22   that was occurring.  And they did not reconvene until shortly

23   after 8:00 p.m. that same day.

24           With respect to the defendants in this case,

25   Messrs. Montgomery, Knowlton and Mr. Wilson met at the Yours

1   Truly Hotel in Washington, DC on that morning.  They went

2   together to the Stop the Steal Rally.  Mr. Knowlton was wearing

3   a flack jacket during the speech in which they were present.

4   President Trump told the crowd, "We fight like hell and if we

5   don't fight like hell we are not going to have a country

6   anymore."  And also said that after this, "We are going to walk

7   down -- and I will be there with you.  We are going to walk

8   down -- we are going to walk down any one you want, but I think

9   right here, we are going to walk down to the Capitol.  And we

10  are going to cheer on our brave senators and congressmen and

11  women.  And we are probably not going to be cheering so much

12  for some of them."

13        At 2:01 p.m. Messrs. Montgomery, Wilson and Knowlton

14  crossed into the restricted area on the Capitol grounds.  At

15  approximately 2:20 p.m., Mr. Montgomery grabbed Officer DH's

16  baton and tried to wrestle it away from him.  Mr. Montgomery

17  fell to the ground.  And while on the ground, he continued to

18  wrestle the baton away from Officer DH, and kicked Officer DH

19  in the chest as he was doing so.  I will note that in addition

20  to what is in the stipulated facts that the video shows that

21  before this happened, Mr. Knowlton engaged in an aggressive and

22  angry exchange with the police officers present asking them

23  about their oaths, but doing so in an aggressive and highly

24  confrontational way.

25        And I think it could only be perceived by the

1    officers at that time as confrontational and aggressive.

2    Messrs. Montgomery, Knowlton and Wilson then proceeded up the

3    upper west terrace stairs with a large mass of people who were

4    jeering loudly.  And they proceeded up to the upper west

5    terrace door.

6            They entered through the upper west terrace door.  At

7    the time they entered the Capitol, they knew that it was

8    typically restricted in some capacity.  And I conclude that

9    they knew they were not allowed to enter the building at that

10   time.  I understand the defense has argued that they did not

11   engage in any violence to enter the building, didn't enter

12   through any broken windows or the like, but there was a loud

13   alarm that was sounding.  People outside were screaming loudly.

14   There were signs inside the door stating it was an emergency

15   exit only.  The alarm was clearly audible.  And I conclude they

16   knew as they entered the building they were not allowed to

17   enter the building at that time.

18           They passed by some officers.  And there has been a

19   suggestion made that the officers were inviting them in or

20   acquiescing in their entry and I think the only fair inference

21   is that the officers were vastly outnumbered and quite wisely

22   chose not to confront the crowds at that time for purposes of

23   their own physical safety.  They didn't know who was armed, who

24   wasn't armed in the crowd.  People had backpacks and were

25   carrying various items.  There was an overwhelming number of

1    people who were entering who were angry and chanting.  And the

2    fact that the officers didn't confront Messrs. Montgomery,

3    Knowlton and Wilson, to my mind, doesn't have substantial

4    bearing on the case.  The video then shows that Messrs.

5    Montgomery, Knowlton and Wilson proceeded down the hallway.  To

6    get to the stairs that went up to the gallery level, they had

7    to pass through, again, a riotous situation where it was clear

8    that the police officers were outnumbered, situation was out of

9    control, individuals were acting in aggressive and violent

10   manners.  And they had to have proceeded past that on their way

11   up to the Senate gallery.  As they were walking in the hallway

12   on the 3rd floor towards the gallery, Mr. Knowlton stated, "We

13   have a right to choose our electors, we are not going to have

14   communist China choose them for us.  We are not going to have

15   the Democratic Party choose them for us."  And Mr. Montgomery

16   and Mr. Wilson were nearby as he made that statement.

17           At approximately 2:43 Messrs. Montgomery, Knowlton

18   and Wilson were present outside the Senate gallery where

19   several US Capitol Police officers were wearing dark-colored

20   blazers and were trying to lock the doors to the Senate

21   gallery.  One individual yelled, "Don't lock another door" and

22   grabbed the door as other individuals assaulted the two US

23   Capitol Police officers.

24           I will add here, based on my review of the video,

25   that it was clear that these officers were in danger.  They

1    were violently assaulted.  There were a number of individuals

2    with their fists raised and Messrs. Montgomery, Knowlton and

3    Wilson were standing right there as these officers were being

4    violently assaulted in order to keep the door to the Senate

5    gallery open, so that individuals could enter the gallery.

6          And I take from this a couple of observations.  First

7    of all, if there was any doubt ever about their lawful presence

8    at this point in time, it is overwhelmingly clear they are

9    going somewhere they are not allowed to be.  In addition, they

10   are taking advantage of the fact that these police officers or

11   US Capitol Police officers have just been assaulted in order to

12   gain entry to the Senate gallery.  And they are among the very

13   first individuals to enter the Senate gallery through the door

14   that has been breached, based on the violent assault on these

15   US Capitol Police officers.  And rather than come to the aid of

16   the officers in any way -- and I am not saying they had a legal

17   obligation to do so.  But they have maintained at times in this

18   case they were supportive of the Capitol Police.  And they

19   certainly were not supportive of the Capitol Police at this

20   point in time.  And rather than do anything to help them, they

21   take advantage of the fact the officers had been assaulted and

22   immediately enter the Senate gallery.

23          I will say, looking at the video and it is not

24   entirely clear to me -- it looks like Mr. Wilson may at one

25   point in time at least briefly reach out his arm to restrain

1    one of the individuals who was assaulting one of the

2    officers -- and restrain may be too strong a word, but puts his

3    arm between the officer and the individual who was assaulting.

4    It is not entirely clear me to from the video exactly what is

5    happening there.  That is the only gesture in any way to assist

6    the officers.  But as I said, I am not saying there was a legal

7    obligation to assist the officers.  What is most salient to my

8    mind is that the three defendants immediately seize on the fact

9    the officers have been assaulted to gain entry to a space they

10   certainly know they are not allowed to enter.

11           They then enter the gallery where Mr. Wilson chants,

12   "Treason, treason, treason."  You see Mr. Knowlton leaning over

13   and looking down to the floor of the gallery.  It is at this

14   point that Mr. Wilson takes a black bag containing the escape

15   hoods from the Senate gallery.  On looking at the video -- and

16   I spent a fair amount of time looking at the video here.  I

17   think it is important to add some more context to what was

18   happening there.

19           There were two individuals who leaped down from the

20   gallery to the Senate floor.  And I can't say with 100 percent

21   certainty that the defendants heard his, but one of those

22   individuals in a very loud voice yells out, "If I go down there

23   and open the doors, will you storm?"  And there is a lot of

24   discussion about yelling to open the doors.

25           You then see one of the individuals proceed to open

1    one of the doors to the Senate, which happens to be the door

2    that the three defendants then congregate at shortly later.

3    And it is only after that victim then leaps down and goes and

4    actually opens the door and someone yells that he has opened

5    the door that you then see, Messrs. Montgomery, Knowlton and

6    Wilson then leave the gallery, proceed fairly expeditiously

7    down the stairs to the Ohio clock hallway.

8            And a couple of observations about what I see in the

9    video as they then proceed down to the Ohio clock corridor, one

10   is, it looks to me as though Mr. Knowlton has something in his

11   hand as well as Mr. Wilson.  And it appears to me that it is

12   something that he also has taken from the Senate gallery.  He

13   proceeds first into the hallway.  He then seems to see the

14   police officers standing at the end of the hallway.  He goes

15   back and goes out of sight, but appears to be conferring with

16   Mr. Montgomery and Mr. Wilson at this point.  Mr. Knowlton then

17   comes back and very clandestinely throws the package to the

18   ground that he had in his hand.  Mr. Wilson sees that and then

19   goes and puts the bag containing the escape hood down on top of

20   a piece of furniture, which then, I noticed, another rioter

21   then goes into.  They then proceed down the hallway fairly

22   quickly.  And there has been talk about if they were trying to

23   get into the Senate, well, why didn't they just try the doors

24   there.  They proceed to the area where they have seen the

25   individual open the door to the Senate.  And it seems to me

1   that what they are doing is they are going to the spot where

2   they have seen the door is open and has been opened and they

3   are going to that spot.

4           They then proceed to the area near Senate Minority

5   Leader Charles Schumer's Office, which was close to the Senate

6   chamber.  And there they interact with Officer BM.  And I have

7   reviewed the video repeatedly of those interactions.  And there

8   are a couple of videos showing those interactions.  Officer BM,

9   if called to testify, would have testified that he was assigned

10  to that area to prevent anyone from entering the Senate.  You

11  hear on the video, one -- an officer, presumably a superior

12  officer say, "Lock it down" at that point in time.  And at that

13  point in time, the officers made clear that no one else can

14  come through that area.  A number of individuals confront

15  Officer BM, who is assigned to guard the area at that time.

16          And that is where the exchange occurs between the

17  defendants and Officer BM.  Officer BM recalls that

18  Messrs. Montgomery Wilson, and Knowlton were more aggressive

19  than the other rioters he had encountered that day.  And based

20  on my review of the video, I think that is certainly true with

21  respect to Messrs. Knowlton and Montgomery and I think less

22  true with respect to Mr. Wilson.

23          And turning to the transcript, which is at appendix

24  A, which I have confirmed by my own review of the video,

25  Mr. Knowlton in particular is quite aggressive with Officer BM.

1    And as I think I indicated in my questioning, during the

2    parties' arguments, it is not entirely clear to me whether

3    Mr. Knowlton is actually jabbing his finger at times into

4    Officer BM's chest or coming very close.  But he is right in

5    his face and he is jabbing his finger in a violent way right at

6    him, is clearly angry and aggressive in his interaction with

7    Officer BM at that point.  And he says, "This is not about us.

8    This is bigger than me.  It is bigger than you.  It is about

9    this.  It is about this, everyone's right to self government."

10   Then picking up on President Trump's statement perhaps at the

11   Ellipse he says, "We are with you guys.  You think these people

12   in this building would fight for you?"  And tellingly,

13   Mr. Knowlton as he is talking about these people fighting for

14   you, he is pointing at the Senate chamber where he is trying to

15   gain entrance indicating, to my mind, that he believes that the

16   Senators are actually in there.  And he is pointing at them and

17   talking about those people, that is the Senators.

18          In addition, both Mr. Montgomery and Mr. Knowlton

19   tell the officers to essentially stand down.  Mr. Montgomery

20   says, "We are the ones sticking up for you.  We are on your

21   side.  You are on our side.  What are you guys doing?"  In

22   other words, why are you stopping us from getting into the

23   senate chamber where we think the Senators are.  Mr. Montgomery

24   says, after someone says -- or Officer BM says, "We are here

25   doing our job."  Another individual says, "So we are the Nazis.

1     We are the Nazis."

2               And Mr. Montgomery says, "I know.  But you have got

3     to stop doing your job sometime and start being Americans.  You

4     have got to quit doing your job and be an American."  And I

5     take it that he is telling them to stop -- to not perform their

6     duty to protect the Senate and to allow them in, in order to

7     support Mr. Montgomery's view of what it means to be an

8     American, but is urging them to stop guarding the Senate and to

9     disregard their duty as law enforcement officers.

10              Mr. Knowlton says, "This is a moment in history.

11    Right now is a moment in history.  We don't want to push

12    through there."  And that, again, to my mind, sounds like a

13    threat.  It is not a statement of, we are not going to push

14    through there.  It is a statement of, we don't want to push

15    through there, a little bit like someone saying I don't want to

16    punch you in the eye.  And I think it is reasonably understood

17    as a threat.  And based on what Officer BM said, I think it is

18    fair to say that he viewed it that way.

19              Mr. Knowlton also says, "We do not want to push

20    through there.  What side?"  And then it is unintelligible.

21    "Try now" unintelligible "Heavy on your brother" and then

22    Mr. Montgomery says, "All you have got to do is step out of the

23    way," get out of our way -- and I am adding this, get out of

24    the way so that we can get on to the Senate where the senators

25    are, in their view.

1              Mr. Montgomery then says, "Just step out of the way,

2    that is all you have got to do."  And Mr. Knowlton says, "For

3    the love of your country."  And there are other statements

4    Mr. Montgomery says, "This is our house.  This is our house."

5    Mr. Knowlton says, "This is happening.  Our vote doesn't matter

6    so we came here for change."  And I think that is important as

7    well.  Because he is saying that, well, the vote isn't what

8    matters, we came here for change otherwise.  And then

9    Mr. Montgomery says, "This is our house.  We pay your salary.

10   Lives matters."

11              And Mr. Wilson who is not up and center through this

12   and he is certainly not the way Mr. Knowlton is in the

13   officer's face, as they are walking away, we came all of the

14   way from our job to do your job and the freaking senator's job.

15              Officer BM would testify and the parties have agreed

16   he would testify that he believed that when Mr. Montgomery

17   says, "All you have got to do is step out of the way" that he

18   meant he wanted the police to allow the rioters into the Senate

19   chamber to confront the senators.  And that is consistent with

20   my view of the video as well and I think reasonable inferences

21   that can be made from that.  Officer BM would also have

22   testified and the parties agree he would have testified that he

23   believed that Messrs. Montgomery, Knowlton and Wilson

24   eventually left the area once there was an increased police

25   presence and because it was clear he wasn't going to let them

1    through into the Senate chamber.  And that is also consistent

2    with my view of the evidence and that it wasn't that they just

3    simply decided not to pursue things, but the police

4    reinforcements of the police arrived and it was clear that the

5    police at least at that point had the upper hand in that one

6    area.  I think that things were particularly threatening for

7    Officer BM because he didn't know whether anyone was armed.

8    They had backpacks.  Mr. Knowlton was wearing a flack jacket.

9    And as I said, they were acting in a very aggressive manner.

10           Then at 2:52 immediately before exiting, Mr. Knowlton

11   spoke with two police officers, as depicted in trial

12   Exhibit 14.  And Mr. Montgomery and Mr. Knowlton were standing

13   nearby.  I am not sure if that should say Mr. Knowlton.  This

14   is paragraph 50 in the stipulation.  One officer asks if

15   everyone wants to get out?  An individual whose face was

16   obstructed responds, "Yes."  And the seconder officer says,

17   "That way."  And then at that point, Messrs. Montgomery,

18   Knowlton and Wilson walk in the direction of the second officer

19   and they exit the building at 2:53 p.m.  So those are my

20   findings of fact.

21           With respect to each of the legal claims, I will

22   start with the claim against Mr. Montgomery in Count 1 under 18

23   U.S.C. section 111(a)(1).  And the parties agree that the

24   elements of that offense are that the defendant assaulted,

25   resisted, opposed, impeded, intimidated or interfered with

1   Officer DH, an officer from the Metropolitan Police Department.

2   The defendant did such acts forcibly.  The defendant did such

3   acts voluntarily and intentionally.  That Officer DH was

4   assisting officers of the United States who were then engaged

5   in the performance of their official duties.  And the defendant

6   made physical contact with Officer DH or acted with the intent

7   to commit another felony.  And that namely, the offense charged

8   in Count 10.

9           I find beyond a reasonable doubt that Mr. Montgomery

10   did assault Officer DH, an officer of the Metropolitan Police

11   Department.  He did those acts forcibly.  That Mr. Montgomery

12   acted voluntarily and intentionally.  That Officer DH was

13   assisting officers of the United States who were engaged in the

14   performance of their official duties, namely guarding the

15   Capitol.  And Mr. Montgomery made physical contact with Officer

16   DH.  Stipulated Exhibit 1, which is the body-worn camera

17   footage from Officer DH, shows Mr. Montgomery grabbing the

18   officer's baton, falling to the ground and then kicking the

19   officer in the chest.

20           As set forth in the stipulated facts at approximately

21   2:02 p.m., Mr. Montgomery grabbed Officer DH's baton and tried

22   to wrestle it away from him.  Officer DH held on to the baton

23   and he and Mr. Montgomery fell to the ground.  And while on the

24   ground, Officer DH and Mr. Montgomery attempted to wrestle

25   control of the baton from each other.  As set forth in

1    stipulated fact 32, during this incident Mr. Montgomery kicked

2    the officer in the chest as depicted in the video.  And the

3    Court concludes that each of the elements of that offense are

4    satisfied and the parties have stipulated they agree that the

5    evidence before the Court is sufficient with respect to each

6    element of that offense.

7            Count 5, charges Mr. Knowlton under 18 U.S.C. section

8    1752(a)(1) with entering and remaining in a restricted building

9    or grounds in violation of that provision.  The elements of

10   that offense are the defendant entered or remained in a

11   restricted building or grounds without lawful authority to do

12   so and that he did so knowingly.  And as to Count 5, the Court

13   finds beyond a reasonable doubt that Mr. Knowlton entered or

14   maintained in a restricted building or grounds without lawful

15   authority and he did so knowingly.

16           The defense has conceded that Mr. Knowlton knowingly

17   entered a restricted building or grounds without lawful

18   authority.  According from the defense, Mr. Knowlton has

19   acknowledged that he recognizes there were restricted areas and

20   again were not contesting the section 1752 count.

21           As set forth in the stipulated fact number 2, on

22   January 6, 2021, the exterior plaza of the Capitol was closed

23   to members of the public.  And the grounds around the Capitol

24   were posted and cordoned off in entire areas as well as the

25   Capitol building itself were restricted by the US Capitol

1    Police in part because the vice president and his family were

2    going to be present or were present.

3         As set forth in stipulated fact 4, temporarily and

4    permanent barricades were in place around the exterior of the

5    Capitol building and the US Capitol Police were present and

6    attempting to keep the crowd away from the Capitol building.

7    Stipulated Exhibit 3 and Exhibit 11 show Mr. Knowlton entering

8    the Capitol.  As I said, the alarm was blaring as he entered

9    the Capitol building.  And as I indicated before, I find beyond

10   a reasonable doubt that he knew he wasn't allowed to enter the

11   building when he did so.  But if there were any doubt about

12   that, when the officers were assaulted at the gallery door, it

13   was clear that he was not allowed to enter that area, yet he

14   did so.

15        The stipulated facts also acknowledge that

16   Mr. Knowlton knew at the time that he entered the Capitol that

17   access to the building was typically restricted in some

18   capacity.  And as he approached the upper west terrace door,

19   the exterior double doors were propped open.  People were

20   screaming loudly and a loud alarm was sounding as people were

21   streaming into the building.  And I conclude that Mr. Knowlton

22   knew that he was not allowed to be in the building, knew that

23   it was a restricted area and he nonetheless knowingly entered

24   the building.

25        With respect to the count -- with respect to Count 11

1    against Mr. Wilson for violating 18 U.S.C. section 641, the

2    elements of that offense are the defendant stole, took,

3    embezzled, purloined, knowingly converted to his own use an

4    escape hood.  The escape hood was property of value to the

5    United States or any of its departments or agencies and the

6    defendant intended to deprive without right the United States

7    Government of the use or benefit of the escape hood.  I find

8    beyond a reasonable doubt that Mr. Wilson did steal, take,

9    purloin or knowingly convert for his own use the escape hood.

10    The escape hood was property of some value belonging to the

11    United States or a department thereof and that Mr. Wilson

12    intended to deprive without right the United States Government

13    of the use of that escape hood.

14            I indicated during the presentation of the evidence

15    and the arguments that I had some question about whether the

16    statute was violated, because Mr. Wilson did not actually

17    remove the hood from the building but left it on top of a piece

18    of furniture.  I take from both the parties' stipulations and

19    statements to the Court they are in agreement that the elements

20    of the offense are satisfied and I have satisfied myself as

21    well that they are.  The crime under 641 includes asportation

22    or the wrongful taking and carrying away of property.  But the

23    asportation requirement can be satisfied even by the smallest

24    of movement.  And that is supported by 2 Wharton's Criminal Law

25    at section 2619.  And Justice Ginsburg explains and points to

1    the relevant law as well in her dissent in *Carter versus United*

2    *States* at 530 U.S. 255 and 287.  That was not the basis for

3    dissent.  She wasn't disagreeing with the Court on that issue

4    and was pointing to the relevant law.  And I agree that is the

5    relevant law on the issue.  I also believe that Mr. Wilson's

6    intent was to remove the escape hood entirely from the

7    possession of the United States.  And that he only left it when

8    he encountered the police and was afraid that he would be

9    arrested or face consequences for stealing the hood.  And it is

10   only at that point in time that he clandestinely places it

11   aside so as not to have to walk past a police line carrying

12   something that is clearly stolen property.

13          And I conclude beyond a reasonable doubt that

14   Mr. Wilson intended to deprive without right the United States

15   Government of the use and benefit of the escape hood.  And that

16   although he placed the bag on top of a piece of furniture in

17   the Ohio clock corridor, I find that he had requisite intent to

18   deprive the government of the hood and only placed it there

19   when he saw the police officers.

20          So that leaves the 1512(c)(2) and section 2 count

21   which is charged in Count 10 of the indictment.  And that count

22   charges Mr. Montgomery and Mr. Knowlton and Mr. Wilson with the

23   obstruction of an official proceeding and aiding and abetting

24   in violation of 18 U.S.C. section 1512(c)(2).  And the elements

25   of that offense are that the defendant attempted to or did

1    obstruct or impede an official proceeding.  The defendants

2    intended to obstruct or impede the official proceeding.  The

3    defendants acted knowingly with awareness of the natural and

4    probable consequences of their conduct -- that their conduct

5    would be to obstruct an official proceeding and the defendants

6    acted corruptly.

7         And as to this count, as I have indicated, I think it

8    is a close question, but a close question through the lens of

9    beyond a reasonable doubt standard and the definitions of

10   corruptly that have been adopted by the D.C. Circuit to this

11   point.  Let me just start with a general observation with

12   respect to the actus reus requirement.  And I know that there

13   is some dispute that is in the Supreme Court about what it

14   means or what the statute means and that this Court as well as

15   the Court of Appeals have held that the statute does apply to

16   efforts to obstruct the certification of the election.  And you

17   all are aware of my reasoning and analysis in the opinion in

18   this case and are well aware of the analysis from the D.C.

19   Circuit in the *Fischer* case.  I understand that is all in front

20   of the Supreme Court and may be revisited, refined or set aside

21   by the Supreme Court.  And we'll just all have to wait and see

22   what happens with that.

23        I will say though that based on additional more

24   recent D.C. Circuit precedent and in particular the D.C.

25   Circuit's fairly recent decision in the *United States versus*

1     *Brock*, I think there is also ground in this context to conclude

2     that even if the statute is read as to require some evidence

3     impairment that there is basis to conclude and I do conclude

4     that efforts to interfere with the certification of the

5     election, would violate even under -- the statute even in an

6     evidence impairment standard.  And as the D.C. Circuit observed

7     in *Brock*, central to Congress' electoral certification process

8     "Is the receipt, processing and verification of evidence" that

9     that is "The United States' certificates of the votes cast for

10     president by their respective electors."

11         And in the *Brock* case, the Court goes on in footnote

12     4 to say, *"Brock's* participation in the January 6 riot caused

13     Congress to adjourn this evidentiary process and prevented

14     members of Congress from accessing and reviewing the

15     certificates.  As such, *Brock's* conduct necessarily obstructed

16     the handling, submission, processing and congressional

17     consideration of the evidence of each state's electoral votes.

18     It did so just as much as if *Brock* had grabbed a pile of

19     state's certificates and ran away with them."  And then in

20     quotes again, "In that way, *Brock's* actions impaired the

21     availability of physical evidence of electoral votes for use in

22     the official congressional proceeding."  And I conclude beyond

23     a reasonable doubt that actus reus standard would be satisfied

24     in this case as well.

25         Returning back to the elements.  The Court first

1     finds that the defendants attempted to or did obstruct or

2     impede the official proceedings.  And I don't think this is a

3     terribly difficult finding for the Court to make.  As I

4     previously held, the certification process was an official

5     proceeding.  It occurred in a joint session of the United

6     States Congress that convened in the Capitol in which elected

7     members of the United States House of Representatives and the

8     United States Senate were meeting in separate chambers of the

9     Capitol to certify the vote count of the Electoral College of

10    the 2020 presidential election, which had taken place on

11    Tuesday, November 30th, 2020.  As I just noted earlier, that

12    joint session was required by the Twelfth Amendment to the

13    constitution in Title III, sections 15 through 18 of the United

14    States Code.  And it requires a deliberate and legally

15    prescribed assessment of the balance, lists, certificates and

16    potentially written objections.

17           Here, I conclude that the presence of each of the

18    defendants did, in fact, impede the official proceeding.  The

19    Senate and House of Representatives could not reconvene to

20    continue the certification process until the building was

21    entirely cleared and that everyone who was present had to be

22    removed.

23           The Capitol Police and the Metropolitan Police

24    Department didn't know who was carrying weapons, who wasn't

25    carrying weapons.  And as the record demonstrates, that all of

1    the proceedings before the Congress were effectively suspended

2    until shortly after 8:00 p.m. on the same day.  And it was

3    because the three defendants along with many hundreds of others

4    unlawfully entered and remained in the Capitol building.

5            I also find that all three defendants intended to

6    obstruct or impede the official proceeding and acted knowingly,

7    with awareness that the natural and probable effect of their

8    conduct would be to obstruct or impede the official proceeding.

9    It is true that this case differs somewhat from other cases in

10    that it is a stipulated trial and I don't have all of the

11    social media and other evidence in front of me that is present

12    in some of the other cases.  But when the defendants entered

13    the building and climbed the stairs to the 3rd floor, they

14    could see that a riot was taking place.  They could see that

15    officers were being assaulted.  They could see at the gallery

16    the officers were trying to lock the door and to secure the

17    Senate.  And instead of moving away from that violence,

18    disengaging, leaving the building, they stayed and actually

19    confronted law enforcement officers.  Mr. Knowlton is recorded

20    as saying, "We have a right to choose our electors.  We are not

21    going to have communist China choose them for us.  We are not

22    going to have the Democratic Party choose them for us."  And I

23    think this is demonstrative of his intent.  And that his intent

24    was to interfere with Congress' process of choosing the

25    electors.

1          And that he believed that the process was defective

2    in some way and he was not going to let the democratic

3    representatives certify that Biden had won the election.  He

4    also later told Officer BM, "Our vote doesn't matter, so we

5    came here for change."  And said, "It is about this, everyone's

6    right to self government."  And I think all of that is

7    demonstrative of the fact that his presence there was for

8    purposes of obstructing the proceeding and that he knowingly

9    and intentionally did so and that he certainly, like the

10   others, was aware of the natural and probable consequences or

11   effect of his conduct was to obstruct or impede the official

12   proceeding.  And I can draw a reasonable inference from the

13   natural and probable consequences of his acts that he was aware

14   and intended those consequences.

15          Mr. Wilson shouted "Treason" in the Senate gallery

16   indicating again his unhappiness with how the Senate was

17   proceeding in his view.  And he was there to interfere with

18   that or impede that process.  He later told Officer BM, "We

19   came all of this way from our jobs to do your job and the

20   freaking senator's jobs," which, again, I think supports an

21   inference that he was there to change or interfere with the way

22   the senators were performing their jobs, because he didn't

23   think they were doing it properly.

24          And with respect to Mr. Montgomery, he repeatedly

25   said, "Step out of the way, stop doing your job," to the police

1    officers and "Be an American."  He was telling them to stand

2    down.  And I think that is also strong evidence that his intent

3    was to get on the Senate floor to interfere with the process

4    and thought that the officers should allow them to do that

5    because that was the American thing to do even if it was not

6    their duty to do so.  And I will note as I noted before that as

7    all of this is going on, Mr. Knowlton is pointing at the Senate

8    chamber referring to these people and says, "You think these

9    people in this building would fight for you?"  And he is

10   pointing to the senators, again I think supporting the

11   inference that his intent was to impede.  And Mr. Wilson

12   similarly at one point points to the senate chamber when he is

13   talking about the senator's jobs.

14        To my mind, the hardest question is the question

15   about whether all three of the defendants did so corruptly.

16   And there are numerous definitions of corruptly that have been

17   discussed in the most recent case law.  And the D.C. Circuit

18   has indicated that there is not necessarily one fixed

19   definition of corruptly that applies.  And for my purposes, I

20   have considered three definitions of the word corruptly as it

21   applies here.

22        The first is the one I think that the defendants have

23   actually requested that I apply.  It is the one that the

24   defendants requested I apply.  And that is the definition of

25   corruptly that Judge Walker set forth in his concurring opinion

1   in the *Fischer* case.  And it is one that Justice Scalia

2   referred to in one of his concurring opinions and that I

3   discuss in a footnote in my opinion on 1512(c) in this case.

4   And it comes from Justice Scalia's concurring opinion in part

5   and dissenting opinion in part in the *Aguilar* case.  It is "An

6   act is done corruptly if it is done voluntarily and

7   intentionally to bring about an unlawful result or a lawful

8   result by some unlawful method with a hope or expectation of a

9   benefit to one's self or a benefit to another person."

10           So that is the first definition and the one that the

11  defense has urged that I apply, which I will apply here.

12           The second is from the *Robertson* case, where the

13  Court and majority notes that *Robertson* acted corruptly and

14  based on evidence that he used felonious, that is unlawful

15  means to obstruct, impede or influence the Electoral College

16  vote.

17           And then the third comes from the *Brock* case, where

18  the D.C. Circuit describes Judge Bates' instruction in that

19  case and notes the District Court stated that corruptly

20  requires a showing of dishonesty, improper purpose or

21  consciousness of wrongdoing.  Because each of these showings

22  may be sufficient to show that *Brock* acted corruptly under

23  1512(c) the District Court's interpretation was not plainly

24  erroneous.

25           So I have considered and applied each of those three

1    in considering whether the corruptly standard is satisfied

2    here.  And I think this is a multi-factor analysis in which the

3    Court has to look at all of the evidence put together.

4            And let me start with Mr. Montgomery, because I think

5    his case -- it is perhaps most straightforward, because he did

6    engage in felonious and unlawful means to obstruct, impede or

7    influence the Electoral College vote.  He assaulted the officer

8    outside of the Capitol when he was unlawfully on the Capitol

9    grounds.  And as his later conduct demonstrates, he was there

10    for purposes of obstructing the electoral vote.  So I think

11    that Mr. Montgomery's assaultive conduct and felonious conduct

12    is sufficient under *United States versus Robertson* to satisfy

13    the corruptly standard.

14            I will note as well though that that conduct also

15    shows, to my mind, that not only did Mr. Montgomery engage in

16    that assault outside of the Capitol building, but it shows that

17    he was prepared to engage in violence.  And there have been

18    numerous cases where courts have looked to social media posts

19    where people have made violent comments and concluding that

20    those comments bear on whether the individual then subsequently

21    acted corruptly when they stormed the Capitol building.  And

22    here, Mr. Montgomery's actual conduct, I think, speaks louder

23    than any social media posts would have.  It showed he was

24    prepared to engage in violence that day.  And that he did, in

25    fact, do so.  He also was threatening in the space outside of

1   the Senate when he is demanding that the officer step out of

2   his way.  He is requesting and suggesting that the officer

3   should not do his duty.  He says, "But you have got to stop

4   doing your job sometime and start being American.  You have got

5   to quit doing your job and be an American."  And so he is

6   telling the officers to stand down, to allow them to enter the

7   Capitol and to enter the Senate chamber where I think the

8   reasonable inference is that Mr. Montgomery believed the

9   senators were present.  And that he did so for purposes of

10   interfering with the election.  And I think that is further

11   evidence that he acted corruptly.

12          In addition he says, "All you got to do is step out

13   of the way," which I think again can be reasonably understood

14   as a threat to those officers as they were standing, guarding

15   the Senate and protecting the Senate from assault.  I also

16   think that entering the Senate chamber -- I'm sorry -- the

17   Senate gallery after observing two officers who were viciously

18   attacked and then just brushing past that and entering the

19   gallery unlawfully is further evidence that he knew that he was

20   behaving in a wrongful manner and that he was conscious of his

21   wrongdoing and acting with an improper purpose as he did so.

22          With respect to Mr. Knowlton, I think the question is

23   a little bit closer to my mind, but I also conclude that he did

24   act corruptly.  He did not actually, himself, engage in any

25   physical violence that day but he came dressed for battle

1    wearing a flack vest, which shows some intention as to what he

2    was prepared to do that day.  As I have said before, I think

3    that his interactions both with the police outside the building

4    and inside the building, were exceedingly aggressive.  And I

5    only say that if I were either of those two officers, I would

6    have felt threatened by the conduct, particularly the officer

7    who was just outside the Senate chamber.  Mr. Knowlton was

8    inches away from him.  And his body language was very

9    threatening.  He was gesturing his finger in a violent way at

10   him and yelling as he was doing that.  And was saying, among

11   other things, "We don't want to push through here," which I

12   take is a threat of what he was prepared to do had it not been

13   for all of the police presence that day.

14        I also think that his statement that I have already

15   mentioned outside the Senate gallery as he is coming down the

16   hallway there about not letting -- "We are not going to have

17   the Democratic Party choose them for us."  I think goes to his

18   corrupt motive that day.  I think that actually goes to the

19   Judge Walker test as well or the Justice Scalia test.  And I

20   think the same thing also holds to my mind with respect to

21   Mr. Montgomery.  And I think as to Mr. Montgomery, all three of

22   the tests as I set forth are satisfied.

23        I think as to Mr. Knowlton, the first and the third

24   are satisfied.  And I think as to both Messrs. Montgomery and

25   Knowlton, that there is sufficient evidence for me to find

1  beyond a reasonable doubt that they acted with an intent to

2  procure an unlawful benefit for either themselves or for

3  another person.  And they not only knew they were obtaining an

4  unlawful benefit, but their objective or purpose was to obtain

5  the unlawful benefit.  And that the benefit they sought to

6  obtain for themselves was the election of their preferred

7  candidate.  And the benefit they sought to obtain for somebody

8  else, who was for President Trump, who instructed them to go

9  down to the Capitol and to fight like hell.  And they were down

10  there fighting like hell like he had told them to do to procure

11  the benefit of him to procure his election, even though that

12  was not the result that the Senate or that the Congress was

13  likely to reach on its own, which is the reason they felt the

14  need to intervene in that.  And that they weren't going to

15  allow in the words of Mr. Knowlton, the democrats or the

16  Chinese to make the choice.

17            And, again, with Mr. Knowlton, not only is there the

18  very aggressive actions toward the police, the wearing a flack

19  vest that day, but also like Mr. Montgomery, he quickly enters

20  the Senate gallery after seeing the officers assaulted, which I

21  think is also clear evidence that he -- consciousness of his

22  wrongdoing and he knew he shouldn't be doing that.  And even

23  further to this point where Mr. Montgomery tells the officers,

24  "You have got to stop doing your job sometime and start being

25  an American," what I read that to say is, you don't necessarily

1    and you shouldn't be following the law, you ought to be doing

2    what I, as an American, think is the right result, that is

3    electing President Trump or reelecting President Trump.

4            And Mr. Knowlton in that same exchange with the

5    police officer outside the Senate chamber says, "You think

6    these people in the building would fight for you?"  And I think

7    that is a similar sort of appeal, to my mind.  And as I

8    mentioned earlier, I think sounds the same theme from President

9    Trump's speech, we are here to fight for the result we want

10   regardless of what the process might otherwise dictate.

11           And so I think as to the two of them, the Court is

12   satisfied that the corruptly standard is satisfied.

13           And I should add to that that Officer BM recalled

14   that Messrs. Montgomery, Knowlton and Wilson were more

15   aggressive than other rioters that day.  That is consistent, at

16   least as I said at least with respect to Mr. Montgomery and

17   Mr. Knowlton from my review of the evidence.

18           Nor am I convinced they left simply because they

19   decided that was the right thing to do.  I think it was simply

20   the fact that there was a more substantial police presence that

21   required them, in their views, to leave.

22           With respect to Mr. Wilson, I have to say, I think it

23   is a particular close question to my mind.  And based on my

24   overall view of the evidence, Mr. Wilson's activity that day

25   was considerably less aggressive than others.  He was not in

1    the face of the police officers.  The two comments that he is

2    ascribed as having made is -- one is chanting with others while

3    in the Senate gallery, "Treason, treason, treason."  And then,

4    as they are departing from the confrontation with the police

5    officer outside of the Senate chamber, he says, "We came all of

6    the way from our job to do your job and the freaken senators'

7    job."  He was not dressed in any military gear, did not have

8    any protective gear on.  It is my understanding the three met

9    just that morning.  And so there is not any reason to think

10   they had sort of planned a common scheme or approach to things

11   that day.

12         I don't see him engage in any -- not only assaultive

13   behavior but threatening behavior towards the police officers.

14   The one comment that he made about the freaken senators' job,

15   he makes at a distance from the officers.  I think it arguably

16   could well support a corrupt motive indicating that their role

17   in being there was, in fact, to do the job for the senators and

18   to come out in a fashion different from the senators,

19   notwithstanding the senators' lawful authority to make that

20   determination.

21         I don't think that the second of the three standards

22   that I set forth applies here.  He didn't engage in any

23   felonious conduct that day.  And I think there is a close

24   question in my mind whether he acted with an intent to procure

25   unlawful benefit either for himself or someone else.  I think

1    the final comment does suggest perhaps that is what he was

2    doing.

3         And with respect to the third comment about -- or

4    standard as to whether he knew that he was engaged in wrongful

5    conduct or was conscious of his wrongful behavior, there has to

6    be a nexus between the consciousness of the wrongful behavior

7    and the obstruction that was occurring.  And I certainly agree

8    with the stipulation of facts between the parties that a

9    reasonable trier of fact could conclude beyond a reasonable

10   doubt that Mr. Wilson did act corruptly that day.  But given

11   the beyond a reasonable doubt standard, given the need to make

12   sure that I am cabining 1512(c) in a manner that does not sweep

13   in more garden-variety-type protests, as I indicated in my

14   opinion in this case, I am going to find that the government

15   has not carried its burden beyond a reasonable doubt with

16   respect to Mr. Wilson's corrupt activity for purposes of

17   1512(c).

18        And as I have already said, overall, that conclusion

19   is based on the fact there was no aggressive behavior towards

20   law enforcement that I could perceive.  The one moment where he

21   does encounter law enforcement who are being assaulted outside

22   the Senate gallery, it appears to me and although I can't be

23   certain, he gets the benefit of the doubt on the beyond a

24   reasonable doubt standard, it appears to me that he does reach

25   out his arm to provide some space or protection between the

1    officers who are being assaulted and the rioters who are

2    assaulting them that day.  He does make two comments.  He does

3    improperly and knowingly improperly enter the senate gallery.

4    But I am not convinced beyond a reasonable doubt that that

5    rises to the level of satisfying the corruptly requirement.

6    And I say that in mind that much of what motivated me in my

7    decision in the *Montgomery* case and I think what has motivated

8    some of the division in the D.C. Circuit on this question and

9    presumably the reason that the Supreme Court has granted

10   certiorari in the *Fischer* case is that there is a desire and a

11   need to distinguish between unlawful protests and unlawful

12   protests that rise to the level of a felony for purposes of

13   1512(c).

14          And we have all thought through the various

15   hypotheticals.  And the D.C. Circuit has spoken about the

16   various hypotheticals about the person who stands up in the

17   committee room and starts shouting during a hearing in a way

18   that interrupts the hearing.  And they know that it is going to

19   interrupt the hearing.  The distinction between that case from

20   these types of cases and -- although as I said, I think it is a

21   close question but because of the beyond a reasonable doubt

22   standard and giving the defense the benefit of the doubt and

23   also making sure that I am creating clear daylight between

24   misdemeanor statutes relating to disruptive protesting behavior

25   and the felony of obstruction under 1512(c), I am going to find

1    in favor of the defense -- for Mr. Wilson with respect to the

2    1512(c) count.  So those are my findings.

3              Anything else that I need to address today?

4              MS. NEVIN:  No, Your Honor.

5              THE COURT:  Do I need to -- or do you need a motion

6    with respect to the other counts of the indictment at this

7    point or that is probably for sentencing?

8              MS. NEVIN:  Yes.  It is our intent to do that at

9    sentencing, Your Honor.

10             THE COURT:  Okay.  Well, let me see if there is

11   anything else before we talk about dates for sentencing.

12   Anything else that anyone wants to raise?

13             MR. SULLIVAN:  No, Your Honor.

14             MR. BARBARI:  No, Your Honor.

15             THE COURT:  Okay.  All right.

16             MR. ROOTS:  No, Your Honor.

17             THE COURT:  All right.  So let's pick a date for

18   sentencing.  And I think it probably does make sense to pick a

19   date that is no earlier than the first week of July, just to

20   make sure we have a decision from the Supreme Court in the

21   *Fischer* case before sentencing.  And I think that probably is

22   going to be consistent with the requirements of the Probation

23   Office at this point for preparing PSRs.

24             THE COURTROOM DEPUTY:  Yes, Your Honor.

25             MR. BENOWITZ:  Your Honor, could we look at a date

```
 1    after July?  I am actually going to be out of the jurisdiction
 2    for all of July.
 3              THE COURT:  Through the whole month of July?
 4              MR. BENOWITZ:  Yes.
 5              THE COURT:  When are you leaving?
 6              MR. BENOWITZ:  As soon as possible.
 7              I will be leaving July -- actually, I probably won't
 8    be leaving until July 5th, if we wanted to do the first --
 9              THE COURT:  Let's see, if we can do the first couple
10    of days of July then.  In the old days, the Supreme Court used
11    to spill into July.  They haven't been doing that so much
12    recently.
13              THE COURTROOM DEPUTY:  Your Honor, July 2nd at 10:00?
14              THE COURT:  Does that work for everyone?
15              MR. SULLIVAN:  That works for us on behalf of
16    Mr. Knowlton.
17              MR. ROOTS:  As far as I know, that works for me, as
18    far as I know right now.
19              THE COURT:  Okay.  Does that work for the government
20    as well?
21              MS. NEVIN:  Yes, Your Honor.
22              MR. BARBARI:  That works for us, Your Honor.
23              THE COURT:  Let's put this matter down for sentencing
24    on July 2nd at 10:00 a.m., did you say?
25              THE COURTROOM DEPUTY:  Yes, Your Honor.
```

1          THE COURT:  And I will direct that the defense file

2   its sentencing memoranda on or before the 27th of June and the

3   government file its sentencing memoranda on or before the 20th

4   of June.  And does the government have any objection to leaving

5   the existing conditions of release in place?

6          MS. NEVIN:  No objection, Your Honor.

7          Your Honor, as to the government --

8          THE COURT:  Let me just do that then before I forget.

9   So I will direct then that the defendants remain subject to the

10  preexisting conditions of their release, notwithstanding the

11  convictions now.  And that those remain in place pending

12  sentencing.

13         Ms. Nevin.

14         MS. NEVIN:  Judge, as to the government's sentencing

15  memoranda, is it acceptable to you that we file one memorandum

16  for all three.

17         THE COURT:  That is fine.  However you want to

18  proceed.  And I assume the defendants will each want to file

19  separate ones, which is fine too.

20         MS. NEVIN:  Thank you.

21         THE COURT:  And in pushing that back, I realize it is

22  possible you all may need supplement based on whatever happens

23  with the Supreme Court.  If that comes up, but I also think you

24  can probably address that in your sentencing memorandum.  And

25  you can probably give me alternatives and say if the Supreme

1    Court does X, this is what we think you should do and if they

2    do Z, this is what we think you should do.

3          I should say with respect to the 1512(c) convictions,

4    I recognize here that the conduct at issue is significantly

5    less egregious than in a number of the other 1512(c) cases that

6    have resulted in convictions.  I don't know if it is on the

7    bottom end of the spectrum or not because I don't know all of

8    the range of cases.  There maybe others that are even less

9    egregious.  But that, obviously, is a fair issue for sentencing

10   and we can take those issues up at sentencing.

11         All right.  Anything else before we adjourn then?

12         MS. NEVIN:  No, Your Honor.

13         MR. ROOTS:  No, Your Honor.

14         THE COURT:  Okay.  All right.  Well, thank you all.

15         (Proceedings concluded at 12:25 p.m.)

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3               I, SHERRY LINDSAY, Official Court Reporter, certify

4      that the foregoing constitutes a true and correct transcript of

5      the record of proceedings in the above-entitled matter.

6

7

8

9

10                          Dated this 5th day of April, 2024.

11

12                          _____
                            Sherry Lindsay, RPR
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25