### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-46 (RDM)** |
| **GARY WILSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.

For the reasons set forth herein, the Government requests that this Court sentence Gary Wilson to 10 months' incarceration, one year of supervised release, $500 in restitution, and a mandatory assessment of $25. The Government calculates Wilson's Guidelines range as zero to six months. Ten months incorporates an upward variance reflecting the fact that Wilson committed theft as part of a calculated effort to obstruct the peaceful transfer of presidential power. The Guidelines range, which reflects only a misdemeanor theft, does not account for that obstruction.

### I.    INTRODUCTION

The defendant, Gary Wilson, and his codefendants, Patrick Montgomery and Brady Knowlton ("Defendants"), participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

losses.[1]

A mob of thousands of rioters forced the Senate and the House to evacuate their chambers and suspend for hours their constitutional duty to certify the results of the 2020 presidential election. Defendants were among those who disrupted the certification of the electoral college vote on January 6.

All three Defendants confronted police officers numerous times during their illegal journey through the Capitol, making it more difficult for police to clear and secure the Capitol. Wilson stole a bag containing escape hoods from the Senate Gallery, which were meant to protect spectators witnessing our governmental processes during an emergency like the riot Defendants joined. While in the Gallery, Defendants saw another rioter open the door to the Senate Floor, so they proceeded downstairs to attempt to enter the Senate Floor. Police stopped Defendants near the entrance to the Senate Floor, and Wilson yelled to a police officer, "We came all the way from our job to do your job, and the freaking Senators' jobs!", making clear he believed the Senators were in the Senate Chamber, and that he was at the Capitol to stop them from certifying the election.

Wilson's conduct on that day was aggressive and highly confrontational. The Court must also consider that Wilson's conduct on January 6, like the conduct of scores of other defendants,

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the Government recommends that the Court sentence Wilson to 10 months of incarceration to reflect the gravity of his effort to stop the peaceful transfer of power and his callous theft of an item from the very place where the certification was supposed to occur.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The Government refers the court to the Statement of Facts for Stipulated Trial filed in this case, ECF No. 233 at Section II, ¶¶ 1-7, for a summary of the January 6, 2021, attack on the United States Capitol by rioters attempting to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.    Defendants' Role in the January 6, 2021, Attack on the Capitol

Montgomery was the link among Defendants. Montgomery knew Wilson before January 6 through a mutual interest in hunting. Montgomery and Knowlton were friends before to January 6. On the morning of January 6, 2021, Defendants met at the Yours Truly hotel in Washington, D.C. When they left the hotel, Knowlton was wearing a flak jacket. Defendants discussed that, if there was violence against protestors by counter protesters in the afternoon, they did not want to walk back to the hotel alone in the evening, so they should try to stick together.

After leaving the hotel, Defendants walked to an area near the Washington Monument and the Ellipse to hear the speakers at the "Stop the Steal" rally. Defendants were present for some of President Trump's rally at the Ellipse. During that speech, President Trump told the crowd, "We fight like hell, and if you don't fight like hell, you're not going to have a country anymore," as

well as, "we're going to walk down to the Capitol – and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them."

By 2:01 p.m., Defendants crossed into the restricted area on Capitol grounds, and were near the scaffolding erected on the west front of the U.S. Capitol. At approximately 2:02 p.m., Knowlton initiated "an aggressive and angry exchange with police officers present asking them about their oaths but doing so in an aggressive and highly confrontational way... [that] could only be perceived by the officers at that time as confrontational and aggressive." Trial Tr. 3/20/24 at 6.

Immediately thereafter, Montgomery approached Officer D.H. from the side, grabbed the officer's baton, and tried to wrestle it away from him. Officer D.H. held onto the baton, and he and Montgomery fell to the ground. While on the ground, Officer D.H. and Montgomery wrestled over control of the baton. Image 1, below, is a screenshot from Officer D.H.'s body-worn camera footage showing his struggle with Montgomery over the baton. Knowlton and Wilson stood a few feet away and watched Montgomery and Officer D.H. fight for control of the baton.



*Image 1 (Stipulated Trial Exhibit 1): Screenshot from Officer D.H.'s body-worn camera footage showing MONTGOMERY (green jacket) and Officer D.H. (black gloves) attempting to gain control of Officer D.H.'s baton.*

As they struggled over the baton, with Knowlton and Wilson still looking on, Montgomery kicked Officer D.H. in the chest. Image 2, below, is a screenshot from Officer D.H.'s body worn camera footage, showing that kick.



*Image 2: Screenshot from Officer D.H.'s body-worn camera footage (Stipulated Trial Exhibit 1) showing MONTGOMERY kicking Officer D.H.*

At approximately 2:28 p.m., Defendants ascended the Upper West Terrace Stairs with a mass of individuals who were "jeering loudly" (Trial Tr. 3/20/24 at 7), as captured in Image 3.



*Image 3: MONTGOMERY (green), KNOWLTON (red), and WILSON (yellow), ascending the Upper West Terrace Stairs.*

5

At approximately 2:35 p.m., Defendants entered the United States Capitol Building through the Upper West Terrace Door, as captured in Image 4, below.



*Image 4: MONTGOMERY (green), KNOWLTON (red), and WILSON (yellow), entering the Capitol Building through the Upper West Terrace Door.*

As Defendants approached the Upper West Terrace Door, the exterior double doors were propped open, people were screaming loudly, and an alarm was blaring as rioters streamed into the Capitol. There were signs on the inside of the doors stating, "EMERGENCY EXIT ONLY." Defendants knew they were not allowed to enter the building at that time. *See* Stipulated Trial Exhibit 16, 08:40 to 09:41.

At approximately 2:35 p.m., USCP Lt. D.M. was standing inside the Upper West Terrace Door, near the stairs leading up to the Rotunda. *See* Stipulated Trial Exhibit 16 at 09:00. The rioters vastly outnumbered Lt. D.M. and his fellow officers at that breach point. Lt. D.M. made the tactical decision to not escalate the situation by deploying weapons, and instead took a defensive position for the safety of his fellow officers and the rioters.

After entering the building through the Upper West Terrace Door, Defendants climbed the stairs to the second floor and entered the Rotunda at approximately 2:36 p.m. They left the Rotunda approximately two minutes later and climbed the stairs to the third floor.

Defendants then passed through a "riotous situation where it was clear that the police officers were outnumbered, situation was out of control, individuals were acting in aggressive and violent manners." Trial Tr. 3/20/24 at 8 (statement of the Court). At approximately 2:40 p.m., as Defendants walked on the third floor towards the Senate Gallery, Knowlton stated in substance, "We have a right to choose our electors. We're not going to have communist China choose them for us. We're not going to have the Democratic Party choose them for us." Montgomery and Wilson were a few feet away from Knowlton when he made this statement.

At approximately 2:43 p.m., Defendants and several USCP officers were outside the Senate Gallery. One of the officers tried to lock the doors to the Senate Gallery. Some rioters yelled, "Don't you lock another door!" and "Grab the door!" as others assaulted two of the officers. It was "clear that these officers were in danger. They were violently assaulted. There were a number of individuals with their fists raised and [Defendants] were standing right there as these officers were violently assaulted in order to keep the doors to the senate gallery open, so that individuals could enter the gallery … they are taking advantage of the fact that these police officers … have just been assaulted in order to gain entry to the Senate gallery." Trial Tr. 3/20/24 at 8-9 (statement of the Court).

Immediately after the other rioters assaulted the officers, Defendants entered the Senate Gallery, among the first to do so. By then, the Senate Floor and Gallery had been evacuated, and Defendants could see that the Senate Floor was empty. While inside the Senate Gallery, Wilson joined other rioters in chanting, "Treason! Treason! Treason!"

At approximately 2:47 p.m., Wilson removed from the Senate Gallery a black bag

containing escape hoods,[2] which is government property. as *See* Stipulated Trial Exhibit 5, at timestamp 14:47:39.



*Image 5: WILSON taking the black bag containing escape hoods from the Senate Gallery.*

After observing another rioter jump down from the Senate Gallery to the Senate Floor, Defendants left the Senate Gallery. They went downstairs to the second floor of the Capitol and walked through the Ohio Clock Corridor, where Wilson placed the bag on top of a piece of furniture, as depicted in Image 6.

---

[2] An escape hood is a piece of protective equipment that a user puts over his head to prevent breathing in smoke or contaminated air.



*Image 6: WILSON (yellow) discarding the black bag with escape hoods (blue) on top of a piece of furniture.*

Defendants then walked toward Senate Minority Leader Charles Schumer's office, which was close to an entrance to the Senate Chamber.



*Image 7: KNOWLTON (red), MONTGOMERY (green), and WILSON (yellow) speaking with USCP Officer B.M. (blue) outside of Senator Schumer's office.*

Officer B.M. was assigned as a Senate Chamber Officer on January 6, 2021. At

approximately 2:49 p.m., he was standing in front of Senator Schumer's office, near an entrance to the Senate Floor. His assignment was to prevent anyone from entering the Senate Chamber. Because USCP radio communication was down, Officer B.M. believed the Senators were inside the Chamber.

Around this time, a number of rioters, including Defendants, confronted Officer B.M. and attempted to bypass him and gain access the Senate Chamber. Because these rioters entered the building without authorization and without submitting to screening, Officer B.M. did not know whether they were armed. Officer B.M. recalled that Defendants were more aggressive than the other rioters he had encountered on that day.

Knowlton said to Officer B.M., "We're with you guys." and "This is a moment in history. Right now is a moment in history. We don't want to push through there." Montgomery told Officer B.M., "All you gotta do is step out of way." Officer B.M. did not interpret these statements as expressing sympathy for or solidarity the with police. Rather, he reasonably understood them as threatening and aimed at coercing him to surrender his post so that Defendants could confront Senators inside the Senate Chamber.

Wilson, who was standing with Montgomery and Knowlton, shouted to Officer B.M.: "We came all the way from our job to do your job, and the freaking Senators' jobs!" Officer B.M. believed Defendants eventually left the area once there was increased police presence, and because it was clear that he was not going to let them through into the Senate Chamber.[3]

Defendants left the Capitol building at approximately 2:53 p.m.

---

[3] Defendants' interaction was captured on the body-worn cameras of MPD Officers R.D. (Stipulated Trial Exhibit 8), M.H. (Stipulated Trial Exhibit 9), and C.R. (Stipulated Trial Exhibit 10), as well as CCTV video (Stipulated Trial Exhibit 13, without audio).



*Image 8: KNOWLTON stands atop a police SUV, hand raised and yelling.*

After exiting the Capitol, Defendants did not leave Capitol grounds. Instead, they went to the East Plaza, where a large mass of rioters had gathered. Knowlton climbed atop of a police SUV, as captured in Image 8, above, as Wilson and Montgomery stood near the vehicle.

## III.    THE CHARGES AND BENCH TRIAL

On August 19, 2022, a federal grand jury returned a Third Superseding Indictment charging Defendants with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); and entering and remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B). ECF No. 115. Montgomery was also charged with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); civil disorder in

11

violation of 18 U.S.C. § 231(a)(3); engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); and committing an act of physical violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *Id.* Knowlton and Wilson were also charged with theft of government property, in violation of 18 U.S.C. § 641. *Id.*

On March 18, 2024, the Court conducted a bench trial based on stipulated facts. ECF No. 233. At trial, the Government proceeded against all three defendants on Count Ten of the Third Superseding Indictment, which charged a violation of 18 U.S.C.§§ 1512(c)(2) and 2. ECF No. 115. In addition, the Government proceeded against Montgomery on Count One, 18 U.S.C. § 111(a)(1), against Knowlton on Count Five, 18 U.S.C. § 1752(a)(1), and against Wilson on Count Eleven, 18 U.S.C. § 641. *Id.*

While the parties agreed to a set of facts, they did *not* agree that the defendants' conduct met the elements of Count Ten, alleging a violation of 18 U.S.C. § 1512(c)(2). *See* ECF No. 233 at ¶52. The parties *did* agree, however, that if the Court found the existence of the stipulated facts beyond a reasonable doubt, this evidence would establish each and every element of Counts One, Five, and Eleven. *See id.* at ¶53.

On March 20, 2024, the Court convicted the defendants of the following:

Montgomery:
- Count One: Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1)
- Count Ten: Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2

Knowlton:
- Count Five: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)
- Count Ten: Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2

Wilson:

- Count Eleven: Theft of Government Property, 18 U.S.C. § 641.[4]

In acquitting Wilson of Section 1512(c)(2), the Court said: "I certainly agree with the stipulation of facts between the parties that a reasonable trier of fact could conclude beyond a reasonable doubt that Mr. Wilson did act corruptly that day." Trial Tr. 3/20/24 at 35.

## IV.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Wilson faces one year of imprisonment, a term of supervised release of not more than one year, a term of probation of not more than 5 years, a fine up to $100,000, restitution, and a mandatory special assessment of $25.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Government agrees with the PSR that Wilson's Guidelines are as follows:

**Count Eleven: Theft of Government Property, 18 U.S.C. § 641**

| Base Offense Level | 6 | U.S.S.G. § 2B1.1(a) |
|---|---|---|
| Acceptance of responsibility[5] | -2 | U.S.S.G. § 3E1.1(a) |
| Zero criminal history adjustment | -2 | U.S.S.G. § 4C1.1 |
| Total | 2 | |

The U.S. Probation Office calculated that Wilson has 0 criminal history points; therefore, his Criminal History Category is I. ECF No. 236 at ¶ 58. The Government does not dispute this calculation. Therefore, with a total offense level of 2 and Criminal History Category of I, Wilson's

---

[4] The Court acquitted Wilson on Count Ten.
[5] Wilson stipulated to all facts and did not contest guilt on the Section 641 violation, so he is entitled to credit under U.S.S.G. § 3E1.1.

guidelines range is 0-6 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a sentence that varies upward from the Guidelines range.

### A.    Nature and Circumstances of the Offense

The Court should vary upward because Wilson's offense was no run-of-the-mill misdemeanor theft. Wilson's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis. Wilson himself intended to stop the peaceful transfer of power. This elevates his culpability and makes his misdemeanor conduct more serious.

Wilson joined with his codefendants to breach the Capitol building, making it all the way to the Senate Gallery. Along the way, he stood by as Montgomery, his friend, committed an assault. In the Senate Gallery, instead of the voices of Senators debating the electoral votes, Wilson's voice rang out, chanting, "Treason!" Wilson stole a bag containing escape hoods from the Senate Gallery, which were meant to protect spectators witnessing our governmental processes during an emergency like the riot Defendants joined. Treating such items as souvenirs in the middle of a violent riot that obviously endangered Congress, as Wilson did, displays a troubling callousness toward the widespread human suffering that day—suffering Wilson had personally witnessed. Then, having seen rioters on the Senate Floor, Wilson and his codefendants tried to enter the Senate Floor to make Senators "do their jobs." It was only because of officers like Officer B.M. that

14

Wilson was stopped from actually entering the literal seat of the country's democratic government, where Senators were supposed to be debating the certification.

The Court's sentence must account for the fact that this theft—itself a disturbing act—was but one part of Wilson's effort to stop the peaceful transfer of power. While the Court did not convict Wilson of obstruction, it nevertheless recognized that a reasonable factfinder could have found beyond a reasonable doubt that Wilson acted corruptly. *See* Trial Tr. 3/20/24 at 35. The Court should consider – especially on the preponderance burden that applies at sentencing – that Wilson committed felony conduct. As other judges have recognized, even in the absence of a Section 1512(c)(2) conviction, upward variances are appropriate to recognize defendants' aims to obstruct the peaceful transfer of power. *See, e.g., United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66-67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself").

This Court's sentence should likewise reflect the seriousness of an offense committed with the aim of undermining democracy and the rule of law. The Government is not asking that Wilson's guidelines be calculated using acquitted conduct. Instead, the Government asks the Court to vary upward to account for the seriousness of the offense, which involved an effort to disrupt the peaceful transfer of power. Had Wilson been convicted of obstruction, his Guidelines for that offense would have been 15-21 months (level 14); the Government's recommendation here does not reach even that high.

Wilson's conduct was also aggravated because, while he did not personally commit an assault, his participation with two other individuals was aggravating. His presence alongside

Montgomery's attack on Officer D.H. and alongside Knowlton's aggressive statements to the officers emboldened those actions, and the group jointly confronted officers outside the Senate Chamber. As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961).

Moreover, while the Government concedes that an adjustment pursuant to U.S.S.G. § 4C1.1 applies to Wilson, the Court should vary upward by two levels to account for that reduction. An upward variance is warranted to recognize the context of Wilson's actions: the January 6 riot, a violent and unprecedented attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because Wilson's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, Wilson's conduct caused a

significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sent'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

In summary, Wilson should not receive the same sentence he would as if, for example, he entered the Capitol as a legitimate visitor during a day the Senate was open to the public and simply swiped a souvenir on his way out. The Guidelines do not fully account for the seriousness of Wilson's offense, so the Court should vary upward.

### B.  Wilson's History and Characteristics

Wilson is self-employed owner of a real estate investment firm. Before that, he was the owner of a company named "Outdoor Film Tour" for six years. ECF No. 236 at ¶¶ 92-93. He has

no criminal history. *Id.* at ¶ 57, a fact already accounted for in his Guidelines range (and which, in fact, has already reduced his offense level, should the Court not vary upward as the Government advocates above).

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Wilson's criminal conduct on January 6, particularly his theft and removal of the bag with escape hoods from the location where they could provide United States Senators with protection in the event of an attack, plainly amounted to disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. Although Wilson accepted responsibility by stipulating to certain facts underlying his guilt on one offense, he has not taken any steps to denounce his words and actions on January 6, 2021, including to the Probation officer who conducted his PSR

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

interview. The Court should view any remorse Wilson expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Moreover, with the 2024 presidential election approaching and many of the same influences continuing to sow discord and distrust, the potential for a repeat of election-related violence looms. The Court must sentence Wilson to deter him specifically from going down that road again.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. Here, however, the Guidelines tell only a very small part of the story of the offense.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

20

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As explained above, and as the Court recognized in rendering its verdict, evidence supports a finding that Wilson committed felony-level conduct. As a result, the Court can consider as comparable cases those where a defendant was convicted of violating 18 U.S.C. § 1512(c)(2) as comparators. Many of those comparators, who engaged in similar (or even less serious) conduct that Wilson, received *higher* sentences than what the Government seeks here. This Court has previously recognized at least one January 6 misdemeanor defendant's felony conduct in deciding to impose a higher sentence than it normally would; the same should apply here. *See United States v. Buteau*, 21-cr-489 (RDM), Sentencing Tr. 11/20/23 at 69 (imposing three-month sentence for defendant convicted of a single petty misdemeanor because defendant was "obstructing the police

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

officers who were trying to protect themselves by putting a barrier in place to keep the gate from coming down").

In *United States v. Bender*, 21-cr-508 (BAH); *United States v. Mitchell*, 21-cr-508 (BAH); and *United States v. Roche*, 21-cr-86 (BAH), the defendants were convicted of 18 U.S.C. § 1512(c)(2) and misdemeanor charges following a stipulated bench trial. Each defendant trespassed onto the Senate Floor. The total adjusted offense level for each defendant was 14,[9] as it would have been for Wilson, had he been convicted of obstruction. Bender's Guidelines range, with Criminal History Category II, was 18-24 months, and the Court sentenced him to 30 months. Mitchell's Guidelines range, with Criminal History Category IV, was 27-33 months, and the Court sentenced him to 27 months. Roche was in Criminal History Category I and was sentenced to 18 months. They all received credit for acceptance of responsibility.

Although Bender's and Mitchell's conduct was aggravated by their social media posts, which are not present in Wilson's case, the conduct of these three defendants is comparable to Wilson's. Like these defendants, Wilson reached the Senate; although, unlike these defendants, Wilson actually stole something and, unlike Roche, did not act alone. The Government nonetheless recommends that he receive a significantly lower sentence; should the Court wish to account for the acquittal, the ten-month recommendation, compared to these defendants, does so.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

---

[9] The Court applied the special offense characteristic in U.S.S.G. § 2J1.2(b)(2), resulting in a 3-level increase, as well as a 3-point deduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Wilson would not have received the +3 increase following the D.C. Circuit's decision in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), but, because he contested his guilt on the Section 1512(c)(2) charge, he likely would not have received acceptance credit, either.

restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).[10]

---

[10] The MVRA does not define "offense against property," but Circuit courts have held that "courts may consider the facts and circumstances of the crime that was committed to determine if it is an 'offense against property' within the meaning of the MVRA." *United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020). Although the D.C. Circuit has not yet weighed in, so far, every Circuit to have considered the issue has rejected a categorical approach. This fact-based approach is consistent with the "plain text of the statute . . . [which] suggests that the way the crime is carried out is relevant to its application." *Razzouk*, 984 F.3d at 187. An "offense against property" does not require physical damage to property. Rather, "against property" can include offenses committed in a way that infringes on a victim's property interest or where the defendant derives an unlawful benefit from a victim's property. *See e.g., United States v. Turner*, 718 F.3d 226, 236 (3d Cir. 2013) (conspiracy to defraud the IRS of taxes owed, in violation of 18 U.S.C. § 371, deprived the IRS of its property); *United States v. Boutros*, No. 20-CR-0082 (APM), 2020 WL 6683064, at *1 (D.D.C. 2020) (Mehta, J.) (bank fraud is "an offense against property"). Under any definition, Wilson's theft of the escape hoods constitutes an "offense against property." *See United States v. Cummings*, 189 F. Supp. 2d 67, 74 (S.D.N.Y. 2002) ("an 'offense against property'

23

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).[11]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold each defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the

_____

applies to those offenses in which physical or tangible property … is taken (or attempted to be taken) by theft"). But since Wilson deprived the United States of the escape hoods for only a brief period, it suffered no financial loss as a result of the offense of conviction. For that reason, the Government does not claim the MVRA applies to this case.

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

Wilson deprived the United States of its right to possess the stolen escape hoods for only a short period of time, so the Government is not seeking restitution regarding the temporary loss of possession of the hoods. However, Wilson's commission of an offense against property means that this case is governed by the MVRA and not the VWPA. That means that this Court should order him to pay his proportionate share of restitution towards the total harm against property resulting from the January 6 riot without regard to his ability to pay. Specifically, the Court should require Wilson to pay $500 in restitution for his conviction on Count Eleven. This amount fairly reflects the defendants' role in the offense and damages resulting from his conduct. Moreover, in cases where the parties have entered into a plea agreement, $500 for misdemeanor pleas has consistently been the agreed upon amounts of restitution and the amount of restitution imposed by judges of this Court where Wilson was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

In determining whether to impose a fine, the sentencing court should consider Wilson's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Wilson to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to

burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Wilson's conviction for 18 U.S.C. § 641 is subject to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). Wilson has not shown an inability to pay; thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The Guidelines fine range here is $200 to $9,500.

## IX.   CONCLUSION

For the reasons set forth above, the Government recommends that the Court sentence Gary Wilson to 10 months' incarceration, $500 in restitution, one year of supervised release, and a mandatory assessment of $25.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
202-803-1612
carolina.nevin@usdoj.gov

*/s/ Kelly Elizabeth Moran*
KELLY ELIZABETH MORAN
Assistant United States Attorney
NY Bar No. 5776471
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
202-740-4690
kelly.moran@usdoj.gov