**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:21-CR-00046-RDM** |
| | ) | |
| **GARY WILSON,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.    INTRODUCTION**

Gary Wilson comes before this Court humbled and deeply remorseful for his actions on January 6, 2021 (hereinafter "January 6") and appears for sentencing following a stipulated bench trial in which he was acquitted of the sole felony count – an alleged violation of 18 U.S.C. § 1512, but found guilty of Theft of Government Property, in violation of 18 U.S.C. § 641.  Mr. Wilson respectfully submits this Memorandum in Aid of Sentencing.

With a large community of support surrounding him, Mr. Wilson is sure to turn the page on this dark chapter in his life and is ready to put this all behind him. Based upon his personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, the minuscule likelihood of recidivism, and the need to avoid unwarranted sentencing disparities, Mr. Wilson respectfully requests that the Court impose a term of probation, as such as sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

1

## II.    MR. WILSON'S BACKGROUND

Mr. Wilson is a fifty-five-year-old (55) husband who raised four children with his wife of twenty-seven (27) years, Melissa. *See* Presentence Investigation Report (hereinafter "PSR") at ¶¶ 64, 74-78.  Mr. Wilson lives in South Jordan, Utah but was born in Salt Lake City and spent his childhood in Missouri and Colorado. *Id*. at ¶¶ 64, 81.   He is the fourth of seven children and was raised in the church by his parents, whom he describes as "amazing beacons of light."  *Id*. Growing up, Mr. Wilson was taught about family unity, prayer, love of country, and the importance of learning about different cultures in the world and staying active. *Id*. at ¶¶ 64, 72, 73.  His mother, Ida, is a retired teacher and real estate assistant and his father, Robert, is a retired real estate agent and construction laborer. *Id*. at ¶ 64.  He never witnessed any forms of abuse in the home as a child and his family remains close and supportive. *Id*. at ¶ 72.

Mr. Wilson's faith is central to his life, and at the age of eighteen (18) he participated in a church-related mission to Bolivia where he resided for two years. *Id*. at ¶ 81.  His parents participated in church-motivated mission trips to the Samoan people and the Navajo Nation people in the 1950s and 1970s. *Id*. at ¶ 64.  Mr. Wilson's mother describes her son as honorable and trustworthy, an admirable patriot, one who does good for many people, and a good father who follows the scripture, "ask for a coat, give your coat, ask for food, give your food." *Id*. at ¶ 73. His wife describes him as selfless, kindhearted, hard-working, giving, and the kind of husband who has worked together with her to overcome the normal ups and downs any marriage faces. *Id*. at ¶ 80.  As evidenced by the many letters of support attached to this Memorandum, Mr. Wilson's closest relationships are centered around faith and the church. *See* Exhibits B-W.

Mr. Wilson graduated from high school in 1987, earned an associate's degree from Ricks College in Rexburg, Idaho in 1992, and attended the University of Utah until he left in 1996, just nine (9) credits shy from obtaining a bachelor's degree in political science. *Id.* at ¶ 89. From August 2013 to April 2019, he was the owner of Outdoor Film Tour in South Jordan, Utah. *Id.* at ¶ 93. Since April 2019, Mr. Wilson has been self-employed as the owner of GRW Investments, LLC wherein he invests in properties and rents them out. *Id.* at ¶ 92.

Mr. Wilson is healthy, does not have a reported history of mental or emotional health concerns, and has no history of substance abuse or problematic gambling. *Id.* at ¶¶ 85-87. He has had two knee replacements and requires medication to control high blood pressure. *Id.* at ¶ 85. His wife describes the family's financial situation as "okay" since she was recently laid off from work. *Id.* at ¶ 80. If the Court were to impose a term of imprisonment in this case, the family would struggle financially, and their youngest son would emotionally suffer from his father's absence. *Id.*

Mr. Wilson's close family and friends describe him as a selfless and dedicated father and community member with a good heart who works hard to take care of his family and neighbors. *See* Exhibits B – W. Sacrificing his time, energy, and money whenever his family and friends are in need comes naturally to him. *Id.* Those who know him best describe his actions on January 6 as an aberration and mistake in an otherwise good man's life. *Id.*

### III.   THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 39 (2007), it may not treat that range as mandatory or presumptive, *Id*. at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors . . . make an individualized assessment based on the facts presented," *Gall*, 552 U.S. at 49-50, and explain how the facts relate to the purpose of sentencing. *Id*. at 53-60; *see also Pepper v. United States*, 562 U.S. 476 (2011). The Court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Pepper*, 562 U.S. at 493 (internal quotations omitted).

To ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory…, as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations")).

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the

punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."  *Pepper*, 562 U.S. at 488 (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."  *United States v. Forman*, 436 F.3d 638, 644, n.1 (6th. Cir. 2006).  Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher."  *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2nd Cir. 2006).

## IV.    APPLICABLE U.S. SENTENCING GUIDELINES RANGE

In accordance with the PSR, the following United States Sentencing Guidelines ("U.S.S.G.") analysis applies in this case: *See* PSR at ¶¶ 45-55.

**2023 U.S. Sentencing Guidelines**

U.S.S.G. § 2B1.1(a)(2) – Base Offense Level ..................................................................6

U.S.S.G. § 3E1.1(a) – Acceptance of Responsibility ..................................................-2

U.S.S.G. § 4C1.1(a) and (b) – Zero Point Offender Adjustment ..................................-2

**Total Offense Level** .................................................................................................**2**

Besides two traffic tickets from 1991, Mr. Wilson has no other history of juvenile adjudications, adult criminal convictions, arrests, pending charges, or criminal conduct.  *Id*. at ¶¶

56-62.  Therefore, Mr. Wilson has a criminal history score of zero and a criminal history category of I for sentencing purposes.  *Id*. at ¶ 58.  With a total offense level of two (2) and a criminal history category of I, the resulting  advisory Guidelines range is zero (0) months to six (6) months.  *Id*. at ¶ 122.

### V.       18 U.S.C. § 3553(a) FACTORS

#### A.       The Nature and Circumstances of the Offense

Mr. Wilson's conduct and involvement in the instant offense is beyond regrettable.  In his letter to the Court, he thoughtfully details his repentance and acceptance of responsibility for his wrongful actions on January 6, saying he strayed away from the teachings of his faith and his parents.  *See* Exhibit A.  Mr. Wilson recognizes that his "actions in participating in the crowd that day caused fear and panic" to police officers, staffers, members of Congress, citizens, first responders, and many others.  *Id*.  "Many of these people will forever be impacted with the terror inflicted on [January 6] as they felt life threatened even though I personally had no intentions to harm anyone."  *Id*.  "For that I am deeply sorry and apologetic."  *Id*.

Not excusing his actions, he describes how he was "merely out of control seeking control."  *Id*.  That day, he lacked the inner strength to resist peer pressure.  *Id*.  While in the moment he believed he was standing up for freedom and being patriotic, in actuality he was "letting down those that gave the ultimate sacrifice in honorable ways."  *Id*.  To him, "[t]hat day was not honorable…[i]t was disgusting."  *Id*.  "I took what was not mine and justified it in my mind…but internally I knew I shouldn't 1) be in that building, let alone the senate gallery, and 2) have taken the hooded mask (Duffle bag)."  *Id*.  In the moment, he thought he could use a gas

mask to protect himself from the tear gas he was experiencing inside the Capitol, but in fact he "deprived those [the gas masks] were intended for…." *Id.*

In the days following January 6, and in horror of what had occurred on that day, Mr. Wilson removed himself from all social media and did not encourage any further unrest. *Id.* He has shared with his peers and community that what happened on January 6 was "not ok and can't be repeated." *Id.* "Peaceful protest is welcomed and our given rights in America, but violent protest is not." *Id.* Mr. Wilson recognizes that he overly judged those that he felt were in political opposition to him. *Id.* "In America we must respect opposition and allow all freedom of speech and not allow our emotions to allow us to get out of control." *Id.*

### B.    Mr. Wilson's Personal History and Characteristics

Gary Wilson is deeply loved and admired for his love of family, generosity of spirit, and kindness towards others, as evidenced by numerous letters of support submitted on his behalf. *See* Exhibits B – W.

Ida Wilson is Mr. Wilson's mother. *See* Exhibit B. She describes his life-long faith in God, love of animals, and many achievements early in life such as participation in varsity sports and award-winning marching bands, becoming a state delegate to the State Convention and to Washington D.C., and earning the Eagle Rank in the Boy Scouts of America. *Id.* The poverty that Mr. Wilson witnessed during his church mission to Bolivia in his youth "deepened his compassion for those suffering and struggling." *Id.* "Compassion for the needy and downtrodden has been Gary's life-long activity and becoming his legacy." *Id.* As a father, his family has "witnessed Gary to be a man of God, faithful, prayerful, playful, remorseful, repentant and serving…always

serving." *Id*.  He constantly performs unselfish, "and often unknown," acts of kindness and service. *Id*. According to his mother, Mr. Wilson went to Washington D.C. on January 6 to exercise his freedom of speech "following the call of our national president to protest…." *Id*.  Still, he made a mistake and is "very remorseful for entering the United States Capitol." *Id*.  "Gary has sought forgiveness from his spouse, family, friends and informed associates." *Id*.

Robert Wilson is Gary Wilson's father. *See* Exhibit C.  Robert describes his son as a man of faith who practices core Christian and moral values. *Id*.  "He's always looking to help those [in] need no matter what that need is." *Id*.  Robert has witnessed his son support and sustain his family through self-employment for most of his married adult life. *Id*.  In reflecting upon his son's actions on January 6, Robert knows there was no malicious intent in Mr. Wilson's heart. *Id*.  His son desired only to protest, not commit to a crime, and he only picked up the gas mask bag due to his concern of being tear gassed just minutes before. *Id*.  Furthermore, he notes how his son was willing to put up his arms in defense of an officer at the Senate Gallery doorway when the officer was facing hostile protestors. *Id*.  Even still, he has seen his son take accountability for his actions and knows he took his family to meet in family council to explain his actions and express remorse. *Id*.  "Gary has expressed a remorseful attitude and encouraged others to not make the same mistake…." *Id*.

Melissa Wilson is Mr. Wilson's wife. *See* Exhibit D.  Her letter focuses on Mr. Wilson's "selfless service" to their community and family and how he puts others' needs before his own. *Id*.  As a dad, Mr. Wilson was fully involved in his children's lives, taking them skiing, to boy scout camps, hiking, and showing them how to serve and love others. *Id*.  Even though the children

are grown, he still writes letters to them expressing his gratitude for their presence in his life. *Id*. Additionally, Mr. Wilson is the kind of person that drops everything to help a neighbor in need. *Id*. "I'm truly grateful for his service to others and what example he shows me to be a better person." *Id*. This case has not been easy on their marriage, and his actions on January 6 were "truly out of his character." *Id*. However, this situation has brought them even closer together and helped them lean more on God and their community. *Id*. "You truly come to know what life is about when you have over hundreds of people praying on your behalf." *Id*.

Jake Wilson is Mr. Wilson's oldest son. *See* Exhibit E. Speaking of his dad, "[h]e has always supported me and my family" and "[h]e teaches by example." *Id*. Jake has learned from his dad how to take care of himself, his family, and "to give service for others around us and for those in need of help." *Id*. "He shows how to love." *Id*. Even when the family has struggled, his father shows them how they should still prioritize helping those who are struggling more. *Id*. "My father has shown me to stand up for what is right even when you are the only one." *Id*. Regarding January 6, Jake believes his father went to Washington D.C. because "[h]e was led to believe that people were trying to take [rights given by our founding fathers] away from us, and he needed to make his voice heard." *Id*. "He did not go there to hurt anyone." *Id*. Jake was saddened when Mr. Wilson was found guilty of theft and feels that his father "does too much good for our community and family to have our own government put him away [in prison]." *Id*. "No letter will ever portray what an amazing person Gary Wilson is … [o]nly the people who know him have truly witnessed it." *Id*.

Susan Heap is Mr. Wilson's younger sister.  *See* Exhibit F.  "I always knew I had a champion in my brother Gary…He was the first to help, contribute, and protect me against anyone."  *Id*.  In high school, Mr. Wilson was a popular guy because of his friendly, inclusive demeanor.  *Id*.  He is still in weekly contact with a man from his school days named Darrel who had a severe traumatic accident and was left impaired in both speech and physical abilities.  *Id*.  Even though Darrel got teased in school, Mr. Wilson "was a safe haven for Darrel."  *Id*.  "Eating lunch with him and driving him to school showed others that everyone is somebody in Gary's eyes."  *Id*.  Once, Mr. Wilson found out Darrel was living in a camping trailer without heat and other essentials, Mr. Wilson raised funds to provide Darrel with necessities.  *Id*.

"Gary sees other's plights and wants to help, always."  *Id*.  She describes how Mr. Wilson has "helped stranded drivers on the road, aided an elderly couple in his neighborhood, gave a lot of business to an immigrant starting a company, gave time and a lot of energy to be a Boy Scout troop master for years…He also took a boys youth group to worship service and out for donuts every Friday morning for a few years."  *Id*.  Even through his business in real estate, he uses creative ideas to help people with low funds get into a home of their own.  *Id*.  Mr. Wilson has shown her his remorse for his actions on January 6, and she has seen him become even more thoughtful about his actions and their potential consequences.  *Id*.  "He is tempered but still the compassionate, loving, older brother, looking to help others anyway he can."  *Id*.

Steven Wilson is Mr. Wilson's younger brother.  *See* Exhibit G.  "His interests, intentions, and instincts are to build people and things up…I've never once seen him be malicious or deviant towards anyone at any time – ever."  *Id*.  One time in young adulthood, Steven experienced a

serious accident and was in the hospital in another state far from his family.  *Id*.  Mr. Wilson, upon
hearing about it, immediately made arrangements for his obligations and drove through the night
to be with Steven.  *Id*.  "When others would be discouraged because of the effort or sacrifice
required, Gary would already be mobilized and doing any multitude of things to come to someone's
aid."  *Id*.  "While disappointing and inappropriate, his behavior on January 6 is not what defines
Gary."  *Id*.  Steven spoke with Mr. Wilson shortly after he returned from Washington D.C. and saw
that he was self-aware he had crossed the legal boundary of loving his country and was remorseful.
*Id*.  Mr. Wilson "has not tried to cover his actions with a hallow excuse or blamed others…Rather,
he has taken complete responsibility and has done much to help others learn from his experience."
*Id*.

Florence Moore is Mr. Wilson's friend and neighbor of twelve (12) years.  *See* Exhibit H.
Mr. Wilson "is the most kind, thoughtful, helpful man I know."  *Id*.  Mrs. Moore describes how
her husband had Alzheimer's disease and at one point she thought she would have to find a
healthcare facility for him.  *Id*.  One evening, Mr. Wilson knocked on her door and asked her if she
needed any help.  *Id*.  She told him that the doctor had come that day and said her husband needed
to walk more and that he needed help getting ready for bed and into bed.  *Id*.  Mr. Wilson said that
he would come every evening and help her husband walk around in the house and help get him to
bed.  *Id*.  And this is what Mr. Wilson did, for two years straight.  *Id*.  Mr. Wilson would bring one
of his sons or his wife over to help.  *Id*.  "They never failed, they were so faithful."  *Id*.  "It was
the biggest blessing of my life…I got to keep my husband home!"  *Id*.

Daniel Bowden is a cybersecurity executive, U.S. Air Force veteran, and Mr. Wilson's friend and former neighbor. *See* Exhibit I. "Gary is one of the most thoughtful neighbors I've ever had." *Id*. One cold day, Daniel's irrigation pump had frozen and broken, spewing a fountain of water and turning his back yard into a pond. *Id*. "By the time I discovered it, Gary was already out there, up to his ankles in cold water on a day it was only about 40 degrees…We dug like crazy and laughed until we were both completely soaked, and I finally managed to locate the shut-off valve." *Id*. "What makes Gary different from many other good people I've known, is that Gary is actually a doer of good, not just a talker about it." *Id*. Regarding January 6, it is not a part of Mr. Wilson's character to be associated with people intending to do harm to anyone for any reason. *Id*. Daniel feels that while Mr. Wilson was trying to do something he thought was good, he got mixed up with others who were filled with extreme anger. *Id*. "Unfortunately for Gary, he got into a group of people with ill intentions," and this is something he regrets. *Id*. "I'm certain Gary will not repeat anything like this again." *Id*.

Ann Simmons is Mr. Wilson's neighbor and single mother of four kids. *See* Exhibit J. As a note, Ms. Simmons was not asked to write a letter to this Court, but she volunteered upon hearing of the opportunity. *Id*. "In our religion we are all assigned families to care for, to look out for…Gary was assigned to my family." *Id*. Ms. Simmons' life has been deeply impacted by Mr. Wilson and the "countless acts of service" he has rendered to her family. *Id*. For example, one time she called him about an issue with her parking strip, and within 30 minutes Mr. Wilson had used gravel and a tractor to fix the issue. *Id*. Last summer, Mr. Wilson checked in on her family and when he noticed how hot her house was, he called in a favor to a buddy who promptly came

and got the AC working again. *Id*. On another occasion, her camper trailer blew a tire over an hour away from home. *Id*. Ms. Simmons called Mr. Wilson, and he and his wife came, fixed the tire, and pulled the trailer home. *Id*. When her son rolled his truck up on the canyon one snowy night, Mr. Wilson went and retrieved her son. *Id*. "He and his wife have been my 'first call' for several years now." *Id*.

Allen Harrison is Mr. Wilson's good friend of ten (10) years and past ecclesiastical leader. *See* Exhibit K. "Gary is an incredible person who upholds very high standards of moral, ethical, and spiritual conduct." *Id*. Mr. Harrison describes how within a week of returning home from January 6, Mr. Wilson scheduled an appointment to visit with him. *Id*. "We reviewed the events, counseled together, and concluded that he should take the steps to surrender himself willingly to authorities." *Id*. Mr. Harrison views January 6 as truly out of character for Mr. Wilson. *Id*. "[T]he power of social media and social influence sucked him in." *Id*. "Gary truly regrets his personal actions." *Id*. Even still, Mr. Wilson serves the church, and specifically the youth. *Id*. "I believe that Gary's character is great despite hearing of his conviction." *Id*.

Twelve (12) other friends and family members wrote letters to this Court attesting to Mr. Wilson's character, telling numerous anecdotes demonstrating just how much good Mr. Wilson has done in the world. *See* Exhibits L-W. Diane Creamer, Mr. Wilson's sister writes that "Gary has often been known to sacrifice his Saturdays to meet with a friend or a sibling who is going through a rough patch to lend support and show love." *See* Exhibit L. Mr. Wilson's mother-in-law Karen Laney talks about how he "comes to my home regularly to help with any tasks needed…I watched him patiently help my husband [who suffers from short term memory loss] with a computer issue."

13

*See* Exhibit N.  Mr. Wilson's brother-in-law Robert Meek discusses how he has taken the church youth group around neighborhoods looking for homes that need service, knocked on doors, and provided services free of charge on numerous occasions.  *See* Exhibit O.  Brian Qualls, a longtime friend, tells the story about how Mr. Wilson helped a high school student dying of cancer achieve his bucket list item of going hunting, and Gary coordinated the food, supplies, equipment, and even a special horseback ride, for the trip.  *See* Exhibit P.

The twelve (12) other letters also shed light on Mr. Wilson's remorse for his actions on January 6 and just how much of an aberration that event was in his life.  *See* Exhibits L-W.  Mr. Wilson's sister, Ms. Creamer writes that "[h]e has publicly taken responsibility for his mistakes and expressed deep remorse to friends and family on several occasions."  *See* Exhibit L.  His brother Matt Wilson writes that he has a "broken heart and contrite spirit" about his actions.  *See* Exhibit M.  His mother-in-law writes that "Gary has been very open to discussing what his intentions were, how they changed from peaceful to crossing the line of propriety."  *See* Exhibit N.  His neighbor Ronald Arthur says that "[i]t is not in his nature to be a rioter but rather was a man in the wrong place at the wrong time."  *See* Exhibit Q. Rodger Fry, another friend, says that "h]e confided with me about his sorrow for his actions on that day and voluntarily stepped down from his service in the temple."  *See* Exhibit R.  Joey Gilbert, a fellow church member wrote that "…I have seen firsthand his genuine remorse and determination to make amends."  *See* Exhibit S.

In sum, Mr. Wilson is beloved by his community.  All who are close to him believe in his goodness and that he is not defined by his actions on January 6.  Furthermore, everyone is confident that he will never again be before the Court, and they cannot wait for his full return to life.

### C.      Mr. Wilson Poses Little or No Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured.  Fortunately, Mr. Wilson does not fit the archetype of a person who will commit new criminal offenses or recidivate.  And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended nor designed to predict recidivism."  U.S. Sentencing Comm'n*, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*).  Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C).  Accordingly, the Supreme Court in *U.S. v. Booker* has freed the judiciary to remedy this inconsistency.  *See* 543 U.S. 220 (2005).

In addition to what has already been described about Mr. Wilson's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism.  For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases.  *See Measuring Recidivism* at 12.  With respect to

15

Mr. Wilson, who is fifty-five (55) years old, defendants over the age of fifty (50) with no criminal history points have a recidivism rate of only six-point-two percent (6.2%). *Id.* at 28.

Other findings by the Commission support the conclusion that Mr. Wilson will not commit a criminal offense in the future. For example, defendants with no criminal history points who are legally married, like Mr. Wilson, who has been married to Melissa for twenty-seven (27) years, have only a nine-point-eight percent (9.8%) recidivism rate. *Id.* at 29. Additionally, defendants with no criminal history points who are college graduates, like Mr. Wilson, who has obtained an associate degree, have only a seven-point-one percent (7.1%) recidivism rate. *Id.* The Commission has also found that first offenders like Mr. Wilson are rarely reconvicted of a crime. In fact, only two-point-five percent (2.5%) of first offenders with zero criminal history points and zero prior arrests are ever reconvicted. U.S Sentencing Comm'n, *Recidivism and the First Offender* at Exhibit 6 (May of 2004). There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Wilson would commit any criminal offense in the future.

Beyond the statistics, Mr. Wilson personally presents no risk of recidivism. As detailed by his family and friends, Mr. Wilson has lived his entire life guided by principles completely incongruous with his actions on January 6. As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Wilson himself. Although he has felt crushing remorse for his actions, since his arrest he has kept his focus on taking responsibility for his actions, improving the lives of his family and the community, and living out the principles of his faith.

It is unfortunate that the Guidelines' offense levels do not take into consideration such recidivism data.  Such data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Mr. Wilson is not a person who is statistically likely to recidivate.  And, when one considers such statistics in light of Mr. Wilson's personal history and characteristics, it is safe to assume that he will never again be arrested or charged with an offense.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This factor has become especially important in January 6 cases.  This District is well versed in the now one-hundred-and-four (104) page sentencing comparison chart of all January 6 defendants.[1]  For sake of brevity and to focus the Court's attention, Mr. Wilson asks the Court to consider cases in which both this Court and other judges in this  District have imposed sentences. Each contains important facts that distinguish Mr. Wilson's conduct and support a sentence of probation.

In *United States v. Debra Maimone*, a case that was before this Court, Ms. Maimone pleaded guilty to violating 18 U.S.C. § 641, 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  *See* 1:21-CR-00289-RDM.  The government asked for 3 months' incarceration, 12 months' supervised release, 60 hours' community service, and $1,806 restitution.  *Id*.  This Court sentenced Ms. Maimone to 24 months'

---

[1] Available at https://www.justice.gov/usao-dc/capitol-breach-cases.

supervised release and $1,806 restitution. *Id.* Ms. Maimone's conduct was more serious than Mr. Wilson's conduct. She recorded herself on a cell phone while inside of the Capitol during the riot and smoked a cigarette while in the Lobby. *Id.* at ECF 61. She kicked an office door and stood next to a crowd and filmed them violently pushing through law enforcement and forcing open a door inside the Capitol. *Id.* Outside the Senate Gallery, she picked up government-owned gas masks and put one in a backpack and aided another rioter in putting a gas mask into a different backpack. *Id.* She took a duffel bag containing escape hoods from under a seat in the Senate Gallery, she rummaged through a bag marked "POLICE" and took items from within, and she took government property with her as she escaped the Capitol Building. *Id.*

In *United States v. Tyler Bensch*, a case that was before Judge McFadden, Mr. Bensch pleaded guilty to violating 18 U.S.C. § 641 and 18 U.S.C. § 1752(a)(2). *See* 1:23-CR-00180-TNM. The government asked for 9 months' incarceration, 12 months' supervised release, 60 hours' community service, and $500 restitution. *Id.* The court sentenced Mr. Bensch to 60 days' home detention, 24 months' supervised release, 60 hours' community service, and $500 restitution. *Id.* Mr. Bensch's conduct was more serious than Mr. Wilson's conduct. Mr. Bensch was a member of a group associated with the Three Percent movement and "Guardians of Freedom." *Id.* at ECF 89. After former President Trump's speech, he went back to his hotel room to "kit up" to go to the Capitol, and he put on military fatigues, a tactical vest, a military-style helmet, goggles, one or more chemical irritant cannisters, and a black gas mask. *Id.* He was present at the Tunnel of the Capitol building when rioters were doing a heave-ho effort against officers. *Id.* During the attack on the Capitol, he sprayed bear spray, a chemical irritant, on the face of a person that was not

18

posing a threat to him, and he helped carry back to his hotel a stolen U.S. Capitol Police shield that appeared to have been taken from officers by other rioters from the grounds of the Capitol. *Id.*

In *United States v. Robert Petrosh*, another case that was before Judge McFadden, Mr. Petrosh pleaded guilty to violating 18 U.S.C. § 641. *See* 1:21-CR-00347-TNM. The government asked for 4 months' incarceration, 12 months' supervised release, 60 hours' community service, and $938 restitution. *Id.* The court sentenced Mr. Petrosh to 10 days' incarceration, 12 months' supervised release, $1,000 fine, and $938 restitution. *Id.* Mr. Petrosh's conduct was more serious than Mr. Wilson's conduct. While inside the Crypt he participated in a standoff between rioters and U.S. Capitol Police officers and he told one officer to "Give us Nancy, and we will leave." *Id.* at ECF 33. After breaking through the police officers' barricade in the Crypt, Mr. Petrosh stole both microphones from former Speaker of the House Nancy Pelosi's lectern and smoked a cigarette in the Rotunda. *Id.* On January 9, 2021, he texted a friend, "Got your souvenir … Microphone from congress hall." *Id.*

In no way minimizing Mr. Wilson's conduct, it is important to note that his actions that day are not extreme when placed on the spectrum of January 6 defendants. The facts and context of this case do not support the contention that he went to the Capitol that day for the purpose of violence and destruction.

As a final note, during the last five fiscal years (FY2019-2023), there were ten (10) defendants whose primary guideline was §2B1.1, with a final offense level of two (2) and a criminal history category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. *See* PSR at ¶ 143. Out of these ten (10) defendants, only four (4)  received

a sentence of imprisonment. *Id*. For these four (4) defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 4 months and the median length of imprisonment imposed was 4 months. For all ten (10) defendants in this group, the average sentence imposed was 1 month and the median sentence imposed was 0 months. *Id*.

### E.  Mr. Wilson's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  There is no need for personal deterrence in this case, as Mr. Wilson has endured severe shame and embarrassment in experiencing his loved ones' and community's reaction to his conduct on January 6.  Mr. Wilson, a devoted husband and loving father who has always centered and structured his life around his family and faith, witnessed his life's worst and least Christ-like actions be publicized nationwide.  Furthermore, Mr. Wilson is not the type of person who would commit any further crimes in the future.  Mr. Wilson has no criminal history or prior arrests, and this experience has been a defining moment in his life.

Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Wilson's offense simply by charging and convicting him.  As a result, numerous media outlets will discuss Mr. Wilson and the substance of his offense, as they have done in the past.  Further, Mr. Wilson will be discussed in various conversations and settings among family and friends and within the church for years to come, a shameful reality from which he simply cannot escape.  In short, Mr. Wilson's public demise sends a strong message to anyone who might attempt such conduct in the future.

## VI.    CONCLUSION

Considering the above, Mr. Wilson respectfully requests that the Court impose a term of probation.

Respectfully submitted,

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Rammy Barbari
D.C. Bar No. 1032106
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@PriceBenowitz.com
Rammy@PriceBenowitz.com

*Counsel for Gary Wilson*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.

_____/s/_____
David Benowitz